**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1715

GERALD W. CORDER; MARLYN C. SIGMON; GARNET C. COTTRILL; RANDALL M. CORDER; JANET C. PACKARD; LORENA KRAFFT; CHERYL MORRIS; TRACY BRIDGE; ANGELA NICHOLSON; KEVIN MCCALL; BRIAN MCCALL,

Plaintiffs - Appellees,

v.

ANTERO RESOURCES CORPORATION, a Delaware corporation,

Defendant – Appellant.

---------------------------------

GAS AND OIL ASSOCIATION OF WV, INC.,

Amicus Supporting Appellant,

WEST VIRGINIA ROYALTY OWNERS' ASSOCIATION; WEST VIRGINIA FARM BUREAU,

Amicus Supporting Appellee.

No. 21-1716

GERALD W. CORDER; MARLYN C. SIGMON; GARNET C. COTTRILL; RANDALL M. CORDER; JANET C. PACKARD; LORENA KRAFFT; CHERYL MORRIS; TRACY BRIDGE; ANGELA NICHOLSON; KEVIN MCCALL; BRIAN MCCALL,

Plaintiffs - Appellants,

v.

ANTERO RESOURCES CORPORATION, a Delaware corporation,

Defendant – Appellee.

———————————————

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg.  Irene M. Keeley, Senior District Judge.  (1:18-cv-00030-IMK-MJA; 1:18-cv-00031-IMK; 1:18-cv-00032-IMK; 1:18-cv-00033-IMK; 1:18-cv-00034-IMK; 1:18-cv-00035-IMK; 1:18-cv-00036-IMK; 1:18-cv-00037-IMK; 1:18-cv-00038-IMK; 1:18-cv-00039-IMK; 1:18-cv-00040-IMK)

———————————————

Argued:  September 15, 2022                          Decided:  January 5, 2023

———————————————

Before GREGORY, Chief Judge, NIEMEYER, and THACKER, Circuit Judges.

———————————————

Affirmed in part, vacated in part, and remanded by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Niemeyer joined.  Judge Thacker wrote a separate opinion, concurring in part and dissenting in part.

———————————————

**ARGUED:**  Elbert Lin, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Appellant/Cross-Appellee.  Marvin Wayne Masters, THE MASTERS LAW FIRM LC, Charleston, West Virginia, for Appellee/Cross-Appellant.  **ON BRIEF:**  Erica N. Peterson, HUNTON ANDREWS KURTH, LLP, Washington, D.C.; W. Henry Lawrence, IV, Amy M. Smith, Shaina D. Massie, STEPTOE & JOHNSON PLLC, Bridgeport, West Virginia, for Appellant/Cross-Appellee.  April D. Ferrebee, THE MASTERS LAW FIRM LC, Charleston, West Virginia, for Appellees/Cross-Appellants.  William M. Herlihy, Don C.A. Parker, SPILMAN THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Amicus Gas and Oil Association of WV, Inc.  Howard M. Persinger, III, PERSINGER & PERSINGER, L.C., Charleston, West Virginia, for Amici West Virginia Royalty Owners' Association and West Virginia Farm Bureau.

———————————————

2

GREGORY, Chief Judge:

These consolidated cases involve a dispute between Antero Resources Corporation ("Antero") and a group of landowners ("Lessors") over the payment of natural gas royalties under several oil and gas leases. The leases permit Antero to extract and sell natural gas owned by the Lessors in exchange for royalty payments. Antero appeals from the district court's summary judgment order, which held that Antero breached the terms of the leases by deducting certain "post-production costs" from the royalties it paid Lessors and awarded damages. Lessors cross-appeal the district court's earlier dismissal of their fraud and punitive damages claims against Antero.

We affirm the district court's summary judgment order in part and vacate in part. We conclude that some of the leases prohibit Antero from deducting any post-production costs from Lessors' royalties, but other leases—namely, those that contain a "Market Enhancement Clause"—do authorize deductions in certain circumstances. Separately, we affirm the dismissal of the fraud and punitive damages claims because Lessors did not plead them with sufficient particularity.

I.

A.

Lessors own mineral interests on several tracts of land in Harrison County and Doddridge County, West Virginia. Antero acquired the rights, under several different leases, to operate wells on those tracts to produce and sell natural gas. This appeal concerns

3

lease agreements for seven different tracts.[1]  All eleven Lessors have a continuing interest in most of the seven tracts at issue.

Antero operates several wells on the tracts covered by the leases.  The wells extract the raw minerals, which then collect in a production unit, where they are separated into oil, gas, and water.  Meters measure the volume and chemical composition of the gas from each well before it moves downstream.  The gas then flows from gathering pipelines into one of two larger pipelines:  (1) the ETC Bobcat Pipeline, which is an interstate pipeline that carries unprocessed gas to markets for sale, or (2) a pipeline that transfers unprocessed gas to the Sherwood Gas Processing Plant, which is owned and operated by a company called MarkWest Liberty Midstream & Resources.  Gas transported to the Processing Plant is processed into natural gas liquids ("NGLs").  The NGLs, which are known as "Y-Grade" at this stage, may be sold at the Processing Plant or sent to MarkWest's fractionation plant in Pennsylvania.  The fractionation plant converts the Y-Grade NGLs into more purified products such as ethane, propane, and butane for sale at multiple locations.  Manufacturing Y-Grade NGLs at the Processing Plant also produces residue gas, which is mostly methane.  The residue gas may be transported and sold "in-basin" or transported and sold in more distant "out-of-basin" markets.

In 2015, Antero and a subgroup of Lessors ("Settling Lessors") entered a Confidential Settlement Agreement and Release of All Claims ("Settlement Agreement").  The Settlement

---

[1] The parties and the district court refer to the leases as "Lease 2" through "Lease 9," which corresponds to the exhibit number where each one appears in Lessors' Second Amended Complaint.  *See* J.A. 772–850.  Lease 8 is not at issue on appeal.

Agreement resolved a partition action Antero had brought against Settling Lessors in state court, and, pursuant to the Agreement, Settling Lessors agreed to modify the terms of all but one of the leases at issue in this case.[2]  Thus, for six of the seven tracts, we must consider both the terms of the original lease (as to the Lessors who were not parties to the Settlement Agreement) and the modifications made in 2015 (as to the Settling Lessors).  For the seventh tract (Lease 9), we need only consider the terms of the original lease.

Each lease requires Antero to pay Lessors royalties based on their proportionate share of the gas it extracts and sells.  Generally speaking, royalties are measured as a fraction (typically one-eighth) of the gas's value or the proceeds from its sale.  However, the specific methods the leases use to calculate royalties vary.  Lessors' breach-of-contract claim centers on whether the terms of each lease permit Antero to deduct certain "post-production" costs from Lessors' royalties.  These comprise the expenses Antero incurs to process natural gas into more refined products (such as NGLs) and transport those products for sale.

On this point, the leases fall into three general categories.  The leases in the first category—the original versions of Leases 3, 4, 5, 6, 7, and 9—are silent on the allocation of post-production costs.  These leases use one of a few different methods to calculate royalties.  One simply requires Antero to pay royalties equal to one-eighth of "the price received by [Antero] from the sale" of gas.  J.A. 830 (Lease 5).  Antero characterizes the remaining leases in this category as having "market value" royalty clauses.  They require Antero to pay a fraction of the "value" of gas, the "net amount realized by Lessee . . . from

---

[2] Lease 9 is the only lease unaffected by the 2015 Settlement Agreement.

the sale" of gas, or the "gross proceeds received from the sale of [natural gas] at the prevailing price for gas," all of which are calculated "at the well" or "at the wellhead." *See* J.A. 823 (Lease 3); J.A. 825 (Lease 4); J.A. 834 (Lease 6); J.A. 840 (Lease 7); J.A. 849 (Lease 9).[3] These leases were originally executed in the late 1970s or early 1980s. At that time, it was a common practice for gas to be sold directly at the wellhead. Antero, which acquired an interest in most of the leases in 2012, does not claim that it sells any raw gas at the well.

The second category is a subset of leases that were modified by the 2015 Settlement Agreement. These leases potentially prohibit Antero from deducting *any* post-production costs from Settling Lessors' royalties. Specifically, Paragraph 14 of the Settlement Agreement states that royalties for Leases 3 and 4 "shall be deemed gross royalties and shall be calculated without any regard to any postproduction or market enhancement costs claimed or incurred by Antero." J.A. 1607. The parties dispute whether that language actually applies.

The leases in the third and final category contain a "Market Enhancement Clause." The Market Enhancement Clause states that Antero must bear the costs it incurs to "transform the product into marketable form," but that it may deduct costs from royalties

---

[3] Some of the leases separately require Antero to pay royalties for products manufactured from "casinghead gas," based on the "net value at the factory" of those products. *See* J.A. 823, 825, 849–50. Casinghead gas is a type of gas collected in wells that also produce oil. *See* J.A. 1518. The parties do not discuss casinghead gas on appeal, so we will not address this lease language.

if they "result in enhancing the value of the *marketable* oil, gas or other products to receive a better price." J.A. 1622 (emphasis added). In full, the Clause states:

> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

*Id.* The remainder of the leases modified by the 2015 Settlement Agreement contain the Market Enhancement Clause. In addition, certain Lessors and Antero had modified Lease 2 in 2012 to include the Clause.

The parties dispute whether the leases, in their various forms, allow Antero to deduct two particular types of post-production costs from Lessors' royalties. The first, which Antero refers to as "PRC2," consists of expenses associated with processing, fractionating, and transporting NGLs. The second post-production cost, which Antero refers to as "TRN3," consists of the costs Antero incurs to transport residue gas beyond the first available "in-basin" market to a more distant "out-of-basin" market.[4] J.A. 1046.

---

[4] During briefing on the motions for summary judgment, Antero also discussed a third cost, "COM3," which represents costs of compressing gas at the Processing Plant. J.A. 1468. Because Antero does not discuss the COM3 costs on appeal, we do not address them here.

7

Antero uses a simple "work-back method" to factor these costs into the royalties it pays Lessors. This method starts with the revenue the company obtains from selling the gas products, subtracts the post-production costs, and then calculates each Lessor's proportionate share of the resulting amount. According to Antero, it deducts the PRC2 and TRN3 costs only if they enhanced the return Lessors received. For instance, when Antero sells NGLs, it deducts PRC2 costs only if the "Net Factory Value" (revenue minus costs) of the NGLs exceeds the value of unprocessed gas.

The parties also dispute which natural gas products Antero has sold in recent years. Antero claims it has sold only unprocessed gas from Lessors' wells since August 2018, but agrees that it processed and manufactured NGLs from gas extracted from Lessors' wells prior to that date. Lessors claim that Antero continued processing gas from their wells into NGLs through at least August 2019.

## B.

Lessors sought to resolve these disputes by filing suit against Antero in West Virginia state court. They alleged that Antero breached the terms of the lease agreements, breached its fiduciary duty, and made fraudulent representations and omissions, which entitled Lessors to punitive damages. Antero removed the action to the U.S. District Court based on diversity jurisdiction.

After some motions practice not relevant to this appeal, Lessors moved to amend its complaint a second time, and Antero moved to dismiss all claims. The district court granted Lessors leave to file a Second Amended Complaint but dismissed the fiduciary duty, fraud, and punitive damages claims. It held that (1) the Second Amended Complaint

8

did not allege fraud with sufficient particularity; (2) the fraud claims were barred by West Virginia's "gist of the action" doctrine, which requires that the alleged fraud be independent of a contractual relationship; and (3) Lessors did not allege an independent tort that could support an award of punitive damages. In addition, the court dismissed three Antero affiliates initially named as defendants.

Antero next filed a motion for judgment on the pleadings, based on a "payment and release" clause contained in the Settlement Agreement. Relying on that clause, the district court entered judgment for Antero for any breach-of-contract claims by Settling Lessors that arose before the parties signed the Settlement Agreement in 2015. The court allowed all remaining breach-of-contract claims to move forward.

Following discovery, Antero and Lessors filed cross-motions for summary judgment. Antero sought summary judgment as to all the leases on the grounds that, as a matter of West Virginia law, the leases authorize it to deduct post-production costs using the work-back method. Lessors sought summary judgment only for the leases modified by the Settlement Agreement.

The district court denied Antero's motion and granted Lessors' motion in part. When evaluating the leases, the court applied *Estate of Tawney v. Columbia Natural Resources, LLC*, 633 S.E.2d 22 (W. Va. 2006), which held that a lessee may deduct post-production costs from royalties only if the lease meets certain heightened specificity requirements. In particular, the lease must (1) "expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale"; (2) "identify with particularity the specific deductions the lessee intends to take from the lessor's

royalty"; and (3) "indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." *Id.* at 24.

The district court held that the leases that are silent on the allocation of post-production costs do not satisfy *Tawney*'s requirements, and thus do not permit Antero to deduct any post-production costs. Next, the court determined that all leases modified by the Settlement Agreement—including Leases 3 and 4—adopted the Market Enhancement Clause. However, it concluded that the Clause's language is too ambiguous to satisfy *Tawney*'s second requirement. For the leases with the Clause, the court granted summary judgment to Lessors on the question of breach but held that genuine disputes of material fact remained as to damages.

With the parties' consent, the district court subsequently issued a "final and appealable" judgment that resolved all legal issues for the remaining leases and granted summary judgment to Lessors as to all but one.[5] J.A. 2051–56. In lieu of conducting a trial on damages, the district court instructed that "the sum of $100,000 against Antero shall be treated as if it were the jury's verdict against Antero in the trial." J.A. 2055.

Antero timely filed a notice of appeal from the district court's judgment, and Lessors timely filed a notice of appeal from the earlier order dismissing their fraud and punitive damages claims.

---

[5] The district court granted summary judgment to Antero as to Lease 8, the one "flat-rate" lease. Lessors do not challenge that decision on appeal.

II.

We first address Lessors' breach-of-contract claims. While this appeal involves several different lease agreements with varying royalty provisions, the claims boil down to two questions: (1) whether each lease is subject to *Tawney*; and (2) if so, whether the lease's royalty provisions satisfy the *Tawney* requirements and permit Antero to deduct post-production costs.

We conclude that all the leases are subject to *Tawney*. The leases that are silent on the allocation of post-production costs fail to satisfy the *Tawney* requirements and therefore do not permit Antero to deduct post-production costs from Lessors' royalties. In addition, two leases modified by the Settlement Agreement—Leases 3 and 4—expressly prohibit Antero from deducting any post-production costs from Settling Lessors' royalties. Finally, the modified leases that include the Market Enhancement Clause do authorize Antero to make deductions, but only after the specific product Antero sells becomes marketable. Because some but not all of the leases permit deductions, we affirm the district court's judgment in part and vacate in part.

A.

We review the district court's ruling on cross-motions for summary judgment de novo. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013). In cases involving breach-of-contract claims, we "review de novo the district court's contract interpretation underlying its summary judgment ruling." *Young v. Equinor USA Onshore Props., Inc.*, 982 F.3d 201, 205–06 (4th Cir. 2020). Because this action falls under our diversity jurisdiction, we apply West Virginia contract law on settled issues and "if

11

necessary, predict how the state's highest court would rule on an unsettled issue." *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 279 (4th Cir. 2016).

B.

The leases in the first category are silent on the allocation of post-production costs. Antero concedes that one of these leases (Lease 5) must satisfy the *Tawney* requirements. Lease 5 calls for royalties based on "the price received by the Lessee from the sale" of gas. J.A. 830. The remaining leases in this category calculate royalties "at the well" or "at the wellhead," based on the "value" of the gas, the "net amount realized by Lessee . . . from the sale," of gas, or the "gross proceeds received from the sale of [natural gas] at the prevailing price for gas." J.A. 772–73, 823, 825, 834, 840, 849. Antero classifies these as "market value" royalty provisions and argues that such provisions need not satisfy *Tawney*. According to Antero, *Tawney* applies only to leases that calculate royalties based on the "proceeds" from the sale of gas, like Lease 5. If *Tawney* does not apply, Antero contends, then the leases permit it to deduct post-production costs because it can calculate the "value," "net amount," or "gross proceeds" from gas "at the well" by using the work-back method of deducting post-production costs from the sale price.

The Supreme Court of Appeals of West Virginia ("West Virginia Supreme Court") has not addressed every type of royalty provision that these leases contain. But based on existing West Virginia precedents, we conclude that *Tawney* does apply to these leases.

1.

The West Virginia Supreme Court first established the presumption that the lessee bears post-production costs in *Wellman v. Energy Resources, Inc.*, 557 S.E.2d 254 (W. Va.

12

2001). When it articulated that presumption, the court referred specifically to "proceeds" leases. In a syllabus point, it stated that "[i]f an oil and gas lease provides for a royalty *based on proceeds received by the lessee*, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." *Id.* at 256 (emphasis added); *see Tawney*, 633 S.E.2d at 24 (explaining that West Virginia's constitution requires that "new points of law . . . be articulated through syllabus points"). The court explained that this presumption was "consistent with the long-established expectation of lessors in this State, that they would receive one-eighth of the sale price received by the lessor." *Wellman*, 557 S.E.2d at 265. In a footnote, the court "excluded from [its] discussion" leases that "call for the payment of royalties based on the *value* of oil or gas produced, and sold directly," noting that "there are possibly different issues" with such leases. *Id.* at 264 n.3 (emphasis added). Thus, *Wellman* left open the question whether the presumption also applies to leases that calculate royalties based on a metric other than sales proceeds, such as market value.[6]

Antero argues that the West Virginia Supreme Court's 2006 decision in *Tawney* did not extend the *Wellman* presumption to "market value" leases and instead simply spelled

---

[6] The lease at issue in *Wellman* called for royalties based on "proceeds" from the "sale of gas as such at the mouth of the well where gas . . . is found." *Id.* at 265. However, the *Wellman* court did not actually determine whether that language shifted any post-production costs to the lessors. Instead, it held that the lessee had failed to introduce evidence showing that it actually incurred the costs or that the costs were reasonable, which provided an alternative ground for affirming the district court's judgment in favor of the lessors. *Id.*

13

out the requirements "proceeds" leases must meet to overcome the presumption. But *Tawney* is not so limited.

In *Tawney*, a group of lessors brought a class action challenging the lessee's right to deduct post-production costs under numerous oil and gas leases. *See* 633 S.E.2d at 24–25. Many of the leases called for royalties to be calculated "at the well" or "at the wellhead." *Id.* at 25. Some paired terms like "gross proceeds" or "market price" with the "at the wellhead" language, and others prescribed royalties in "an amount equal to 1/8 of the price, net of all costs beyond the wellhead." *Id*. at 28–29. The leases did not specifically address the allocation of post-production costs. Applying the new three-part test, the West Virginia Supreme Court held that this lease language did not allow the lessee to deduct post-production costs from royalties. *Id.* at 29–30.

Contrary to Antero's argument, the West Virginia Supreme Court's analysis in *Tawney* was not limited to "proceeds" leases. To be sure, the court started by reiterating the *Wellman* presumption—and its reference to royalties "based on proceeds received by the lessee." *Id.* at 23. But the analysis that followed applies with equal force to leases that calculate royalties based on the "value" of gas at the wellhead. The court focused on the ambiguities inherent in the "at the wellhead"-type language, regardless of whether that language is connected to "proceeds" terms or "value" terms:

> While the language arguably indicates that the royalty is to be calculated at the well *or the gas is to be valued* at the well, the language does not indicate how or by what method the royalty is to be calculated *or the gas is to be valued*. For example, notably absent are any specific provisions pertaining to the marketing, transportation, or processing of the gas.

14

*Id.* at 28 (emphasis added in part and omitted in part).  Later in the opinion, the court twice emphasized that "language in an oil and gas lease that provides that the lessor's 1/8 royalty . . . is to be calculated 'at the well,' 'at the wellhead' or similar language" is ambiguous and "not effective" to permit the lessee to deduct post-production costs.  *Id.* at 30.  And when it articulated the three requirements, the court made no mention of "proceeds" leases.  *See id.* at 24, 30.

Further, the royalty provisions at issue in *Tawney* closely resemble some of the leases at issue in the present case.  For one, the court held that leases which called for royalties based on "gross proceeds" "at the wellhead" were ambiguous, as that language "could be read to create an inherent conflict due to the fact that the lessees generally do not receive proceeds for the gas at the wellhead."  *Id.* at 28–29.  Similarly, the court held that the phrase "market price at the wellhead" is ambiguous because "it contemplates the actual sale of gas at the physical location of the wellhead, although the gas generally is not sold at the wellhead."  *Id.* at 29.  Those provisions are essentially identical to the provisions in Leases 6 and 7, which call for royalties based on "the *gross proceeds* received from the sale of [natural gas] at the *prevailing price for gas sold at the well*."  J.A. 834, 840 (emphasis added).  *Tawney* instructs that such language is inherently ambiguous because Antero does not actually sell gas at the wellhead.

*Tawney* did not address the "value at the well" terminology that some of the leases in this case contain.  But the West Virginia Supreme Court's reasoning also applies to such language.  *See Tawney*, 633 S.E.2d at 28 ("While the language arguably indicates that . . . the gas is to be valued at the well, the language does not indicate how or by what method

15

. . . the gas is to be valued.") (emphasis omitted).  Absent any guidance for calculating the "value at the well," that language remains ambiguous.  It *could* refer to the downstream sale price minus post-production costs, but it just as easily could refer to the prevailing price of gas sold at the wellhead.  In fact, the latter is probably the better reading, given that the leases were drafted at a time when it was common to sell gas directly at the wellhead.

In addition, the broader rationale behind the *Tawney* requirements militates in favor of applying them to the "value at the well" leases.  The West Virginia Supreme Court has explained that both *Wellman* and *Tawney* are consistent with the "marketable product rule," which provides that a lessee generally has a "duty, either express, or under an implied covenant, to market the oil or gas produced."  *Id.* at 27 (quoting *Wellman*, 557 S.E.2d at 263–64).  *Tawney* makes clear that parties must use specific, unambiguous language to adopt a contrary rule.

Recent precedent confirms that *Tawney* remains good law.  Just this year, the West Virginia Supreme Court expressly reaffirmed the decision.  *SWN Prod. Co. v. Kellam*, 875 S.E.2d 216 (W. Va. 2022).  Prior to *Kellam*, the court had sharply criticized *Wellman* and *Tawney*, which created temporary doubts about their viability.  *See Leggett v. EQT Prod. Co.*, 800 S.E.2d 850 (W. Va. 2017).  In *Leggett*, it declined to apply *Wellman* and *Tawney* to "flat-rate" oil and gas leases, which are governed by West Virginia Code § 22-6-8.  *See id.* at 853.  The statute required flat-rate leases to calculate royalties based on "the total amount paid to or received by or allowed to [the lessee] at the wellhead."  *Id.* (quoting W. Va. Code § 22-6-8 (1994)).  The court held that the statute permitted lessees to deduct

16

reasonable post-production expenses using the work-back method, even though its "at the wellhead" language was very similar to the language *Tawney* deemed inadequate. *Id.* at 861. While the *Leggett* court declined to overrule *Wellman* or *Tawney*, it questioned "the faulty legs upon which this precedent and its iteration of the marketable product rule purports to stand," and suggested that the decisions resulted in an improper windfall for lessors. *Id.* at 862–63.[7]

But in *Kellam*, the court dismissed *Leggett*'s criticism of *Wellman* and *Tawney* as "a somewhat indulgent frolic," emphasizing that it "was mere obiter dicta and of no authoritative value." *Kellam*, 875 S.E.2d at 225–26. The *Kellam* court confirmed that *Tawney* and *Wellman* "are the result of a reasonable and justifiable interpretation of this State's common law." *Id.* at 226. Thus, *Leggett*'s endorsement of the work-back method for flat-rate leases with "at the wellhead" language (which the West Virginia legislature has since overruled) has no bearing on the interpretation of the freely negotiated leases in this appeal. And in affirming *Tawney*, the *Kellam* court never suggested that the decision applies only to leases that calculate leases based on "proceeds."[8]

---

[7] Following the *Leggett* decision, the West Virginia legislature amended the flat-rate lease statute to specifically require that royalty payments be "free from any deductions for post-production expenses." W. Va. Code § 22-6-8(e) (2021). The amendment effectively overruled *Leggett*.

[8] Antero also cites *Cabot Oil & Gas Corp. v. Beaver Coal Co., Ltd.*, No. 16-0905, 2017 WL 5192490 (W. Va. Nov. 9, 2017). There, the West Virginia Supreme Court noted in dicta that *Wellman* "has never been reversed and continues to be the basis for the law in this state on the deduction of post-production costs." *Id.* at *7 n.16. Nothing in that observation forecloses the possibility that the court would apply the *Tawney* requirements to more than just "proceeds" leases (which *Wellman* itself did not foreclose).

No other West Virginia precedent gives us reason to doubt that *Tawney* applies here. In its efforts to persuade us otherwise, Antero relies heavily on *Imperial Colliery Co. v. Oxy USA Inc.*, 912 F.2d 696 (4th Cir. 1990). There, this Court applied West Virginia law to interpret a lease that required the lessee to pay "one eighth (1/8) of the current wholesale market value at the well for all gas produced," with "wholesale market value" defined as "the prevailing purchase price currently paid at the well." *Id.* at 699. *Imperial Colliery* did not involve a dispute over post-production cost deductions; the parties simply contested whether the lease required the lessee to pay royalties based on the fair market value of the gas or on the actual proceeds from sales. *Id.* at 700. The district court held that the lease called for royalties based on the market value of gas, and we affirmed. In the opinion, we observed that the fact "there was no available wellhead price does not necessarily preclude computation of the gas' [sic] wellhead price," and that a lessee might calculate that value by "deducting compression and gathering expenses" from the downstream sales price (i.e., the work-back method). *Id.* at 701.

Antero latches onto that observation. Because the "wholesale market value at the well" language closely resembles the "value at the well" language in certain leases here, Antero argues that *Imperial Colliery* controls and allows it to use the work-back method to deduct post-production costs from royalties under those leases. But because *Imperial Colliery* predated *Wellman* and *Tawney*, it has no bearing on our analysis of the scope of those decisions. Neither *Wellman*, *Tawney*, nor *Kellam* cited *Imperial Colliery* as persuasive authority.

18

Nor does this Court's decision in *Young v. Equinor USA Onshore Properties, Inc.* help Antero. The lease in *Young* expressly authorized the lessee to deduct post-production costs, listed specific types of deductible costs, and permitted the lessee to use the work-back method to calculate royalties. 982 F.3d at 203–04. The lessor argued that the lease did not describe the method of calculating the amount of deductions in enough detail to satisfy *Tawney*'s third requirement. *Id.* at 207. We disagreed. We decided *Young* soon after the *Leggett* decision, and we noted that *Leggett*'s "criticism of [*Tawney*] and its endorsement of the work-back method inform[ed] our analysis." *Id.* But our analysis in *Young* focused solely on *Tawney*'s third requirement, which we held "may be satisfied by a simple formula" and does not require "an Einsteinian proof for calculating post-production costs." *Id.* at 208. Nothing in *Young* excuses "market value" leases from having to satisfy *Tawney*'s three requirements, particularly now that the West Virginia Supreme Court has reaffirmed that *Tawney* remains good law.

We conclude that *Tawney* applies to the leases that calculate royalties "at the well," including those that look to the "value of the gas." Therefore, Antero may deduct post-production costs from royalties only if the leases meet *Tawney*'s three requirements. None of the leases in this category satisfies even one of them. The leases do not "expressly provide that the lessor shall bear some part of [post-production] costs," let alone "identify with particularity the specific deductions the lessee intends to take" or "the method of calculating the amount to be deducted." *Tawney*, 633 S.E.2d at 24.

19

2.

Antero offers one other reason the leases that are silent on the allocation of post-production costs permit it to deduct such costs. According to Antero, *Wellman* and *Tawney* apply only until oil or gas first becomes marketable, not through the point of sale. Once gas reaches the point of marketability, Antero contends, the presumption that the lessee bears post-production costs no longer applies, and, under *Imperial Colliery*, the leases allow Antero to use the work-back method to deduct costs.

But this argument cannot easily be squared with current West Virginia law. Both *Wellman* and *Tawney* plainly state that the presumption applies through the "point of sale." *Tawney*, 633 S.E.2d at 23; *Wellman*, 557 S.E.2d at 256. Further, the *Tawney* court repeatedly used "point of sale" language when it set out the three heightened specificity requirements. *See* 633 S.E.2d at 24, 28, 30.

That said, the West Virginia Supreme Court has cast some doubt on whether the lessee actually is responsible for costs through the point of sale. In *Leggett*, it suggested that *Wellman* and *Tawney* did not resolve the question. *See* 800 S.E.2d at 856 n.7 (stating that *Wellman* and *Tawney* "muddied the point to which costs must be borne by the lessee by making reference to the 'point of sale' in [their] syllabus points"). The *Leggett* court criticized the "point of sale" approach, contending that it "results in an even bigger windfall for lessors than the 'marketable product' approach" because the lessor "will receive a royalty valued upon the gas in its processed state at the point of sale after the gas has had value added to it solely at the lessee's expense." *Id.* at 862–63 (quoting Brian S. Wheeler,

20

*Deducting Post-Production Costs When Calculating Royalty: What Does the Lease Provide?*, 8 Appalachian J.L. 27–28 (2008)).

And while the *Kellam* opinion suggests we should take the *Leggett* court's criticism of the "point of sale" approach with a grain of salt, it did not definitively resolve this question. Despite repeating the same "point of sale" language from *Wellman* and *Tawney*, 875 S.E.2d at 218, the *Kellam* court did not assess the "point of sale" approach in any depth. Rather, it declined to reexamine "our interpretation of the implied covenant of marketability" because the covenant was "not implicated" by the lease at issue, which addressed how post-production costs were allocated. *Id.* at 226. And at one point, the *Kellam* court characterized the marketable product rule as narrower than the "point of sale" approach. It observed that *Wellman* and *Tawney* "firmly cemented West Virginia as a 'marketable product rule' state, meaning that the lessee bears all post-production costs incurred until the product *is first rendered marketable*, unless otherwise indicated in the subject lease." *Id.* at 221 (emphasis added).

Ultimately, though, we cannot ignore the express "point of sale" language in the syllabus points in *Wellman*, *Tawney*, and *Kellam*. Because the West Virginia Supreme Court has not adopted a contrary rule, we conclude that the *Tawney* requirements apply through the point of sale.

The leases that are silent on the allocation of post-production costs fail to satisfy any of *Tawney*'s three requirements. As such, they do not authorize Antero to deduct the PRC2 or TRN3 costs from Lessors' royalties. We therefore hold that the district court correctly granted summary judgment to Lessors as to those leases.

C.

We next consider whether the 2015 Settlement Agreement modified certain leases to prohibit Antero from deducting *any* post-production costs from Settling Lessors' royalties. We conclude that it did.

This question hinges on the interplay between a few different parts of the Settlement Agreement. Paragraph 14 states that gas royalties for the leases identified in Paragraph 12 and 13 "shall be deemed gross royalties and shall be calculated without regard to any postproduction or market enhancement costs claimed or incurred by Antero." J.A. 1607. Paragraphs 12 and 13 identify the tracts covered by Leases 3 and 4 and adopt earlier modifications certain parties made to those two leases in 2012. J.A. 1606–07.

The district court held that Paragraph 14 is superseded by Paragraph 11. Paragraph 11 states that Settling Lessors "agree to execute leases and lease modifications, and memoranda as necessary as detailed in 'Exhibit A,' the forms of which leases and lease modifications are attached hereto as 'Exhibit C' and 'Exhibit D,' for all the properties identified on the [Master Property List]." J.A. 1606. Exhibit A is the Master Property List ("MPL"). J.A. 1613–14. The Market Enhancement Clause is included within Exhibit D. J.A. 1622.

The MPL identifies the changes the Settlement Agreement made to each lease it covered. It includes Leases 3 and 4, identified as the 50.82-acre tract (Lease 3) and the 54.18-acre tract (Lease 4). J.A. 1614; *see* J.A. 728–32, 1606–07. Critically, the MPL entries for those two leases are different than the entries for most other leases. The entries for Leases 3 and 4 state they were "Affirmed Herein" (by Settling Lessors) or "Already

22

Signed" (by the particular Settling Lessor who executed the 2012 lease modifications that Paragraphs 12 and 13 adopted). J.A. 1614.

By contrast, the MPL uses different language—"Lease," "Lease Mod.," or "Amend Lease"—to identify the changes made to leases that are not specifically addressed in the body of the Settlement Agreement. J.A. 1613–14. By instead describing Leases 3 and 4 as "Affirmed Herein" or "Already Signed," the MPL shows that the Settlement Agreement itself modifies those two leases.[9] Paragraphs 12, 13, and 14 of the Agreement set out those modifications. Thus, the modified versions of Leases 3 and 4 adopted Paragraph 14's prohibition on any deductions for post-production costs, and nothing in Paragraph 11—or the Market Enhancement Clause itself—supersedes that.

Finally, Lessors attempt to claim that *every* lease covered by the Settlement Agreement incorporate Paragraph 14's prohibition on post-production cost deductions. But that plainly conflicts with Paragraph 14 itself, which makes clear that it applies only to Leases 3 and 4. *See* J.A. 1607.

In short, Antero and the Settling Lessors did not agree to amend every lease to include the Market Enhancement Clause. Rather, they agreed to modifications "as detailed in" the MPL, and the MPL shows that Leases 3 and 4 were modified in the body of the Settlement Agreement (including Paragraph 14). As such, the modified versions of Leases 3 and 4 prohibit Antero from deducting any post-production costs from Settling Lessors'

---

[9] The MPL uses the same "Affirmed Herein" language to refer to certain Lessors' interests in other leases that are addressed in the body of the Settlement Agreement. *See* J.A. 1608, 1614.

23

royalties.  Although we disagree with the district court's reasoning, it correctly concluded that Settling Lessors are entitled to summary judgment as to Leases 3 and 4.

D.

That leaves the leases with the Market Enhancement Clause.  As noted above, that Clause requires Antero to cover the costs it incurs to "transform the product into marketable form," but permits Antero to deduct costs from royalties if they "result in enhancing the value of the *marketable* oil, gas or other products to receive a better price."  J.A. 1622.  Antero agrees these leases are subject to *Tawney*, at least through the point of marketability.  The parties' sole dispute is whether the Market Enhancement Clause satisfies *Tawney*'s second requirement—which requires a lease to "identify with particularity the specific deductions the lessee intends to take"—or is otherwise ambiguous.  *Tawney*, 633 S.E.2d at 24.  Antero contends that the Clause unambiguously allows it to deduct costs after *unprocessed gas* first becomes marketable, which would allow it to deduct the PRC2 and TRN3 costs (both of which arise after that point).  The district court disagreed, holding that the Clause fails to satisfy *Tawney*'s second requirement because it does not clearly identify "the products from which" Antero may deduct post-production costs.  J.A. 2006.

We conclude that the Market Enhancement Clause has an unambiguous meaning, but not the one Antero suggests.  Rather, the Clause unambiguously provides that Antero may deduct costs that enhance the value of the product it sells, but only after that particular product becomes marketable.

As a starting point, the term "marketable form" is unambiguous.  By its plain meaning, a product is "marketable" when it is "able or fit to be sold or marketed."

24

*Marketable, The New Oxford American Dictionary* 1038 (2d ed. 2005); *see also Marketable, Black's Law Dictionary* (11th ed. 2019) (defining "marketable" as "[o]f commercially acceptable quality; fit for sale and in demand by buyers"). Lessors urge us to instead treat "marketable form" as synonymous with the point of sale. That would not only defy the plain meaning of the term "marketable," but also would conflict with the Market Enhancement Clause itself, which recognizes that a product may reach a "marketable form" before the point of sale. J.A. 1622 (allowing deductions for "costs which result in enhancing the value of the marketable oil, gas or other products *to receive a better price*") (emphasis added).

The Market Enhancement Clause is also unambiguous as to the "product" that must reach a "marketable form" before Antero may begin deducting post-production costs. The first part of the Clause states that "all oil, gas or other proceeds accruing to the Lessor . . . shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform *the product* into marketable form." *Id.* (emphasis added).

In this context, the plain meaning of "product" refers to the particular form of natural gas that Antero sells. Black's Law Dictionary, for example, defines "product" as "[s]omething that is distributed commercially for use or consumption and that is usu[ally] (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption." *Product, Black's Law Dictionary* (11th ed. 2019). Thus, the Clause focuses

25

on whether the form of gas Antero sells—and on which it must pay royalties—is marketable at the time Antero incurs a cost.[10]  Had Antero instead wished to make the marketability of "unprocessed gas" the reference point, it should have said so.  *See Energy Dev. Corp. v. Moss*, 591 S.E.2d 135, 137 (W. Va. 2003) ("The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee.").

This meaning is further confirmed by the nearby phrase "oil, gas, and other products."  To make sense of the sentence, "products" must modify "oil" and "gas," not just "other."  That is, the Clause is referring to "oil products, gas products, and other products."  The Clause is not concerned with when "gas" first reaches a marketable form, but rather when the particular gas "product" sold does.  The fact that the phrase refers to plural "products" is also significant.  It recognizes that Antero may produce and sell many different types of products derived from natural gas.  Antero's preferred reading departs from the text because it would make only a singular product—unprocessed gas—relevant.

The second part of the Clause does not introduce any ambiguity.  In relevant part, it states that "any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted" from royalties.  J.A. 1622.  When determining whether a contract is ambiguous, we must consider "the whole instrument" and, if possible, "give meaning to every word, phrase, and clause and also render all its

---

[10] The parties' dispute mostly centers on whether NGLs, which the Market Enhancement Clause does not expressly mention, qualify as an "other product" or as "gas." But that misses the point.  Even if NGLs are a form of "gas" rather than an "other product," the Clause is concerned with when the particular gas product sold reaches a marketable form.

provisions consistent and harmonious." *Antero Res. Corp. v. Directional One Servs. Inc. USA*, 873 S.E.2d 832, 842 (W. Va. 2022) (quoting *Henderson Dev. Co. v. United Fuel*, 3 S.E.2d 217, 217 (W. Va. 1939)).  Here, as above, we read the Clause to refer to "oil products, gas products, or other products."

In addition, Antero's preferred reading risks making certain parts of the Market Enhancement Clause superfluous.  The first part of the Clause contemplates that "processing" costs will not be deductible in some circumstances.  But if the proper reference point is the marketability of unprocessed gas, "processing" costs will always be deductible.  That creates serious tension with the rule that an interpreter must "give meaning to every word" in a contract.  *Id.*

Antero suggests our reading would conflict with the marketable product rule and remove any financial incentives for Antero to enhance the value of gas.  But while "[e]vidence of usage or custom may be considered in the construction of language of a written instrument which is uncertain or ambiguous," it "may not be considered to alter the legal effect of or to engraft stipulations upon language which is clear and unambiguous." *Cotiga Dev. Co. v. United Fuel Gas Co.*, 128 S.E.2d 626, 629 (W. Va. 1962).  Because the Clause is unambiguous, we need not go any further.  *See id.* at 628 ("It is not the right or province of a court to alter . . . the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.").  At any rate, we are not persuaded that our decision will eliminate incentives for Antero to enhance the value of gas products.  For example, the Clause permits Antero to

27

deduct the costs of transporting already sellable products to a market where they will receive a higher price.

Finally, in our dissenting colleague's view, the Market Enhancement Clause fails *Tawney*'s second prong because it does not "identify with particularity the specific deductions the lessee intends to take from the lessor's royalty." *Post* at 37 (quoting *Tawney*, 633 S.E.2d at 24). Respectfully, we do not agree that *Tawney* reaches that far. In *Kellam*, the West Virginia Supreme Court declined to establish a "hard and fast rule" for determining when a lease satisfies *Tawney*'s second prong, instead explaining that "the question is tied directly to the specific language of the lease and, if ambiguous, the parties' intent in contracting." 875 S.E.2d at 227. By consenting to the Market Enhancement Clause, Settling Lessors agreed that Antero may deduct an enumerated list of post-production costs from royalties if certain unambiguous conditions are met. Where, as here, the parties' intent to share specific post-production costs in specific circumstances is "clear from the lease terms," *id.* at 223, we do not believe that *Tawney* requires more.

In sum, the Market Enhancement Clause satisfies *Tawney* and has a plain, unambiguous meaning: when Antero pays royalties from the sale of a particular product, it may deduct actual and reasonable costs it incurred after that product became fit for sale, as long as those costs enhanced the value of the product. Because the district court instead treated the Clause as ambiguous, we vacate that portion of the judgment and remand for further proceedings. On remand, the finder of fact will need to determine which products

28

Antero sold during the relevant time frame, when those products became marketable, and whether Antero incurred the PRC2 and TRN3 costs before or after that point.[11]

### III.

With the breach-of-contract issue resolved, we turn to the dismissal of Lessors' fraud and punitive damages claims. In their Second Amended Complaint, Lessors alleged that the named defendants made affirmative misrepresentations regarding the gas collected from the wells and the deductions Antero took from royalties, and that the defendants "failed to report to [Lessors] that they were extracting and selling liquids from [Lessors'] natural gas." J.A. 760. On appeal, Lessors challenge only the dismissal of the latter claim, which they characterize as a claim of fraud by omission or concealment. Because the complaint fails to state that claim with particularity, we affirm.

### A.

We "review de novo a district court's decision to grant a motion to dismiss." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 545 (4th Cir. 2019). When doing so, we "accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018). To survive a motion to dismiss, a complaint must contain sufficient

---

[11] The uncontested facts indicate that Y-Grade NGLs and residue gas first become marketable when they are separated at the Sherwood Gas Processing Plant. *See* J.A. 1046. The TRN3 costs arise after that point and therefore would be deductible from residue gas royalties under the Market Enhancement Clause. By contrast, the record is not entirely clear on the scope of the PRC2 costs. *See* J.A. 1494.

facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *Edmonson*, 922 F.3d at 553. This requires the plaintiff to allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Edmonson*, 922 F.3d at 553. However, "a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* (citations omitted).

Lessors ask us to adopt a relaxed Rule 9(b) standard for allegations of fraud by omission or concealment, given that critical facts related to such allegations are uniquely within the defendant's knowledge and control. The Fourth Circuit has not yet addressed this issue, but several of our sister circuits do relax the Rule 9(b) standard when certain facts are peculiarly within the defendant's knowledge. In such cases, they have explained, "allegations based on information and belief may suffice, so long as the allegations are accompanied by a statement of facts upon which the belief is founded." *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 493–94 (9th Cir. 2019) (quotation marks omitted); *see United States ex rel. Russell Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999), *abrogated on other grounds by United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928 (2009); *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998);

30

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994); *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992); *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987).

We agree with that approach. In cases involving alleged fraud by omission or concealment, it is well-nigh impossible for plaintiffs to plead all the necessary facts with particularity, given that those facts will often be in the sole possession of the defendant. Applying the ordinary Rule 9(b) standard in such cases would "create a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery." *Emery*, 134 F.3d at 1323. When alleging fraud by omission or concealment, plaintiffs may partly rely on information and belief without running afoul of Rule 9(b). However, they must state the factual allegations that make their belief plausible. We stress that this relaxed standard "does not *eliminate* the particularity requirement." *Devaney*, 813 F.2d at 569.

B.

Even under a relaxed Rule 9(b) standard, Lessors' fraud allegations are not adequate.

To begin, Lessors offered very few facts that identify *when* Antero allegedly withheld royalties. They stated the date Antero first became a party to each lease, *see, e.g.*, J.A. 727–28, and that Antero was a party to the leases "prior to and during the times complained of herein," J.A. 752. These facts establish only that the alleged fraud took place after Antero had acquired interests in the leases. Lessors also alleged that the defendants "provided plaintiffs with statements alleging disclosure of specifics" regarding

31

the amount of gas extracted, the revenue Antero received, and the deductions taken from royalties, and that the defendants "concealed, suppressed, and omitted material facts . . . in connection with the bases for charging plaintiffs for specific services . . . associated with the calculation of plaintiffs' royalties and deductions therefrom." J.A. 757. Taken together, these factual allegations support a reasonable inference that the alleged fraud occurred when the defendants made royalty payments and/or gave Lessors an accounting of the gas extracted from their land. Finally, Exhibit 10 to the Second Amended Complaint contains several one-page excerpts of royalty payments Antero made to each Lessor, which include gas sales dates ranging from 2013 to 2017. J.A. 851–61.

This is not enough. Taken as true, the allegations establish that the fraud occurred *at some point* after Antero acquired the leases and that "defendants" omitted or concealed material information from *some* royalty statements or other information sent to Lessors. But that hardly makes Antero "aware of the particular circumstances for which [it] will have to prepare a defense at trial." *Edmonson*, 922 F.3d at 553. Take, for instance, the fact that certain Lessors were parties to the 2015 Settlement Agreement, which contained a payment and release clause that the district court held barred any claims by the Settling Lessors that predated the Agreement. From the complaint, Antero could not know whether those Lessors were alleging fraud through the date of the complaint or only through the date of the 2015 Agreement. One cannot expect Lessors to allege each specific statement from which information was withheld, but at the very least, Rule 9(b) requires them to allege a particular starting point or explain why they lack sufficient information to do so. They did not do that here.

32

In addition, the Second Amended Complaint does not adequately identify Antero as the individual defendant who committed the fraudulent omissions or concealment. In *Juntti v. Prudential-Bache Securities, Inc.*, this Court affirmed the dismissal of a fraud claim against multiple defendants where the complaint referred generally to the actions of "defendants." 993 F.2d 228 (Table), 1993 WL 138523, at *2 (4th Cir. 1993) (per curiam). We explained the complaint was inadequate because it "impermissibl[y] aggregat[ed] defendants without specifically alleging which defendant was responsible for which act." *Id.*; *see also DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."). "It is not sufficient to argue that each count [of fraud] . . . incorporates the factual allegations of the Complaint, which specify each defendant's individual conduct," because "[t]he burden rests on plaintiffs to enable a particular defendant to determine with what it is charged." *Juntti*, 1993 WL 138523, at *2 (cleaned up).

Here, the Second Amended Complaint suffers from the same deficiencies as the complaint in *Juntti*. The paragraphs in the fraud count refer generally to "defendants." *See* J.A. 760 ("*Defendants* . . . failed to report to plaintiffs that they were extracting and selling liquids from plaintiffs' natural gas, thereby denying plaintiffs the rents and royalties to which they were due." (emphasis added)). While the fraud count incorporates the factual allegations that precede it, and some (but not all) of those allegations do refer to Antero individually, *Juntti* held that was not enough. *See Juntti*, 1993 WL 138523, at *2.

33

To be sure, *Juntti* involved allegations of affirmative misrepresentations, and in some cases, a plaintiff alleging fraud by omission or concealment might not have enough information to allege which individual defendant(s) withheld information.  But here, Lessors failed to identify a specific defendant even where it was possible to do so.  In particular, they presumably knew which individual defendant(s) sent information about the volumes and sales of gas extracted and royalty payments made.  For example, the royalty payment excerpts included in Exhibit D specifically identify "Antero Resources Corporation" as the sender. *See* J.A. 851.  Even under a relaxed pleading standard, Lessors had no excuse for neglecting to identify, in the fraud count itself, which individual defendants "failed to report . . . that they were extracting and selling liquids from plaintiffs' natural gas."  J.A. 760.  The fraud count leaves open the possibility that Lessors "meant to charge only some defendants but that all defendants would have considered themselves so charged." *Juntti*, 1993 WL 138523, at *2.  For this reason, we conclude that the allegations did not identify the individual defendants with enough particularity.[12]

---

[12] The district court also held that Lessors' fraud claim was barred by West Virginia's "gist of the action" doctrine, which requires that alleged fraud be independent of a contractual relationship. *See Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 577 (W. Va. 2013) (explaining that the "gist of the action" doctrine bars tort actions where "the alleged duties breached were grounded in the contract itself").  Because Lessors failed to plead fraud with particularity, we do not need to resolve that question.  At any rate, the district court's analysis seems well-supported.  In the Second Amended Complaint, Lessors identified only one specific duty that was not grounded in the contract:  the "duty to account for" the volume and sales of gas extracted from Lessors' properties.  J.A. 757.  Lessors do not cite any authority, either from West Virginia or other jurisdictions, that clearly identifies a non-contractual duty to account. *See Swearingen v. Steers*, 38 S.E. 510, 511 (W. Va. 1901) (describing a "duty to keep and render a strict account of the output [of mining operations]," but in a case where the litigants were parties to a contractual agreement).

34

C.

Because Lessors did not sufficiently plead a fraud claim, the district court correctly dismissed their punitive damages claim. "Generally, absent an independent, intentional tort committed by the defendant, punitive damages are not available in an action for breach of contract." *Berry v. Nationwide Mut. Fire Ins. Co.*, 381 S.E.2d 367, 374 (W. Va. 1989). While there are some limited exceptions to this rule, *see id.*, none applies here.

IV.

For the foregoing reasons, we affirm the district court's summary judgment order in part, vacate in part, and remand for further proceedings consistent with this opinion. Specifically, we affirm summary judgment as to (1) the leases that are silent on the allocation of post-production costs and (2) the two leases modified by the Settlement Agreement to prohibit any deductions, and vacate as to the leases that contain the Market Enhancement Clause. We affirm the dismissal of Lessors' fraud and punitive damages claims.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

THACKER, Circuit Judge, concurring in part and dissenting in part:

With respect for my colleagues in the majority, while I concur, in part, I also dissent, in part. I would affirm the judgments and reasoning of the district court across the board. *Corder v. Antero Res. Corp.*, No. 1:18-cv-30, 2021 WL 1912383, at *1 (N.D. W.Va. May 12, 2021).

I.

In my view, as to the award of partial summary judgment to Appellees and the denial of summary judgment to Appellant, the district court did not err in holding that the language in the leases relied upon by Appellant is insufficient to allow it to deduct any portion of the costs that it incurred between the wellhead and the point of sale from Appellees' royalty payments. Because West Virginia jurisprudence does not suggest that *Estate of Tawney v. Columbia Natural Resources, LLC*, 633 S.E.2d 22 (W. Va. 2006) is limited to proceeds leases, I agree with the majority that the district court properly determined that the leases at issue are subject to the heightened specificity requirements established in *Tawney*. *Ante* at 11. *Tawney* mandates that to allocate some of the post-production costs to the lessor, the language in the lease must:

> (1) expressly provide that the lessor shall bear some part of the post-production costs between the wellhead and the point of sale; (2) *identify with particularity the specific deductions the lessee intends to take from the lessor's royalty* (usually 1/8); and (3) indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

*Tawney*, 633 S.E.2d at 24 (emphasis supplied). As the majority opinion points out, "[t]he parties' sole dispute is whether the Market Enhancement Clause satisfies *Tawney*'s second

36

requirement—which requires a lease to identify with particularity the specific deductions the lessee intends to take—or is otherwise ambiguous." *Ante* at 24.

I disagree with the majority's conclusion, however, that the district court erred in finding that the terms "marketable form" and "other products," as used in the Market Enhancement Clause, are ambiguous. On this point, the district court determined that the Market Enhancement Clause does not satisfy *Tawney*'s second prong "because it does not identify with particularity the costs that [Appellant] may deduct from [the Settling Appellees'] royalty payments." *Corder*, 2021 WL 1912383, at *10. In reaching this conclusion, the district court held that the term "marketable form" is ambiguous because the Market Enhancement Clause does not make clear "what efforts must be undertaken to get oil, gas, and other products into their marketable form." *Id*. As for the term "other products," the district court found that this term is ambiguous because it is unclear "[w]hether the parties intended to include NGLs as 'other products' within the Market Enhancement Clause for which [Appellant] bears the manufacturing costs, or intended to exclude NGLs as 'other products' and thereby require [the Settling Appellees] to share the cost of extracting and fractionating NGLs." *Id*. at *9. I agree with the district court.

For their part, the majority relies upon dictionary definitions of the words "marketable" and "product" in support of the conclusion that "marketable form" unambiguously means the point in which the product can be marketed or sold, *Ante* at 24–25, and that "other products" simply refers to the particular form of natural gas that Appellant sells. *See id*. at 25. In my view, the majority's interpretation of the Market Enhancement Clause is misguided for two reasons. First, the suggested dictionary

37

definitions do not shed any light on *when* the product becomes marketable nor do they provide any insight as to which products the parties intended to include in the category of "other products," for which Appellant is required to bear the costs associated with transforming into their marketable form.  Second, the majority's interpretation of the Market Enhancement Clause is contrary to the spirit of *Tawney*, as such interpretation would relieve Appellant of its obligation to specifically identify the costs that it seeks to deduct from Appellees' royalty payments.  In discussing the *Tawney* test, the Supreme Court of Appeals of West Virginia recently noted that the *Tawney* court "observed that parties to oil and gas leases are well within their rights to contract for the sharing of post-production costs if they so choose, but *the intent to do so must be clear* from the lease terms." *SWN Prod. Co. v. Kellam*, 875 S.E.2d 216, 223 (W. Va. 2022) (emphasis supplied). That intent is not clear here.

True, the Market Enhancement Clause "requires [Appellant] to cover the costs it incurs to transform the product into marketable form, but permits [Appellant] to deduct costs from royalties if they result in enhancing the value of the marketable oil, gas or other products to receive a better price." *Ante* at 24 (citation omitted).  But this does not establish that the Market Enhancement Clause complies with *Tawney*'s requirement to specifically identify the post-production costs that the parties clearly intended to share because the Market Enhancement Clause "fails to indicate when [Appellant's] efforts become enhancing rather than transforming." *Corder*, 2021 WL 1912383, at *9.  As a result, the lack of clarity as to the what the parties intended to include as deductible post-production costs precludes a finding that the Market Enhance Clause satisfies *Tawney*'s second prong.

38

In sum, the district court's reading of the Market Enhancement Clause is supported by the well-settled principle that pursuant to West Virginia law, "the [Settling Appellees] were entitled to know the specific costs [Appellant] could deduct from their royalty payments." *Corder*, 2021 WL 1912383, at *11. Because Appellant failed to state the costs that it intended to deduct from the Settling Appellees' royalty payments with specificity, I would affirm the district court's grant of summary judgment in favor of Appellees.

## II.

The district court likewise did not err in dismissing Appellees' fraud and punitive damages claims. On these points, I concur with the majority that the district court correctly dismissed Appellees' fraud and punitive damages claims because Appellees failed to particularly allege a fraud claim and "absent an independent, intentional tort committed by the defendant, punitive damages are not available in an action for breach of contract." *Berry v. Nationwide Mut. Fire Ins. Co.*, 381 S.E.2d 367, 374 (W. Va. 1989).

Accordingly, I respectfully dissent, in part and concur, in part.

39