## Kier *versus* Peterson.

*Trover, when and for what it Lies.— What constitutes Waste in Tenant for Life.— Construction of Lease of Lands for the Manufacture of Salt.— What passes under the Agreement.—Measure of Damages in Trover.*

1. Trover will not lie for petroleum or carbon oil, which had risen naturally with the water from salt-wells, in lands leased for the manufacture of salt, and which after reaching the surface had been separated and sold by the lessees.

2. Two persons leased land for the purpose of boring salt-wells and manufacturing salt, so long as the salt-well contemplated in the lease should be carried on by them, the survivor, or their assigns, under certain provisions for forfeiture, and for a rent of every twelfth barrel of salt manufactured: after a time oil arose with the salt water, which, though first suffered to run to waste, was afterwards collected and sold. In trover therefor, it was *held:*

1. That the lease was in effect a grant of the crude salt in the land for a twelfth of the manufactured article:

2. That as the salt only was granted, the lessor retained all the rest of the contents of the land, including the oil, as exclusively after the lease as before:

3. That as the lessees could not raise the salt water without raising petroleum, the severance of the oil, as an inevitable incident to the grant of the right to take salt water, was lawful, as was their possession of it, after it was raised to the surface:

[Kier *v.* Peterson.]

4. That trover by the lessor would not lie for the oil so raised, for he had not the right of possession at the time of conversion by the lessee, either of the oil itself or of the land from which it flowed:

5. That the proper remedy was by bill in equity for an account; and

6. That the measure of damages was the value of the oil, at the instant of separation from the freehold.

ERROR to the District Court of *Allegheny county*.

This was an action on the case brought in the court below by Lewis Peterson against Samuel M. Kier, who survived Thomas Kier. The plaintiff declared in trover for 50,000 gallons of carbon oil or petroleum, of the value of $20,000, to which the defendant pleaded not guilty.

The oil, for which the suit was brought, was the unexpected product of certain wells which had been sunk by the defendant on land leased to him by the plaintiff, for the purpose of manufacturing salt.

There were no disputed facts in the case, and the amount of damages due to the plaintiff (if entitled to recover at all) was agreed upon by the counsel on both sides; for which a verdict was entered, subject to the opinion of the court in banc, on the questions of law presented by defendant's counsel.

On argument, the court delivered a learned and elaborate opinion on the reserved points, and directed the entry of judgment on the verdict. The case was thereupon removed into this court, where the ruling of the court below was assigned for error. All the material facts of the case will be found in the opinion of this court.

*Hamilton & Acheson*, for plaintiff in error, contended: 1. That Kier had a freehold estate for life at least in the land described in the lease, determinable on the happening of the contingencies therein mentioned, but not limited to any particular portion of the demised premises; that he was therefore entitled to all the rights and privileges of a tenant for life, and, without proof of having caused or stimulated the flow of the oil, he was not chargeable with " waste :" citing and commenting on Lynn's Appeal, 7 Casey 44; Harlan *v.* The Lehigh Coal Company, 11 Id 287.

2. That the lessor could not maintain this action without proof that he had a right of property in the oil at the time of the conversion, to wit, when it was intercepted by the tenant. But as its origin and source were unknown, it was, like the elements, only susceptible of a qualified ownership: 1 Bl. Com. 317; Acton *v.* Blundell, 12 M. & W. 324; Tyler *v.* Wilkinson, 4 Mason's A. R. 401.

He must also have had the right of possession at the time: 2 Saunders on Pl. & Ev. 1138. The conversion, which took place the instant the lessee assumed ownership of the oil, took

[Kier *v.* Peterson.]

place on the demised premises on which the lessor could not enter to take possession of the oil without being guilty of trespass.

*D. W. & A. S. Bell,* for defendant in error, insisted that the rights and privileges ordinarily incident to a tenancy for life, were, in this case, modified and restricted by the terms of the lease or agreement between the parties, which included nothing more than the use of the land leased for the manufacture of salt, for certain rents therein mentioned. The doctrine of waste is not applicable to this case: the question simply is, whose oil is this which comes up with the salt water, for which the land was leased? It belongs to the owner of the reversion, no matter what its value may be, or what may be done with it, if not granted in express terms to the lessee.

2. The source of the oil may be unknown, but as it does not flow, but is a permanent matter found upon the lessor's land, and only comes out of it when dug for, the right of property is in the owner of the reversion.

As to his right of possession, it can be exercised anywhere and at any time, if the rights of the lessee are not interfered with. The lessee was, perhaps, not bound to preserve this oil, but, having done so, it belongs to lessor, and is then, as severed from the freehold, personal property, and the action is well brought: Mather *v.* Ministers of Trinity Church, 3 S. & R. 511; Shult *v.* Barker, 12 S. & R. 273.

The opinion of the court was delivered, March 22d 1862, by

READ, J.—On October 30th 1837, Lewis Peterson entered into articles of agreement with Thomas Kier and Samuel M. Kier, by which he leased to them and their assigns a certain lot or piece of ground owned by him in the county of Allegheny, and adjoining the Pennsylvania Canal, with the privilege on the said premises to bore salt-wells and erect all manner of buildings necessary or useful in the prosecution of the manufacture of salt; and to use all coal in the hill in the rear of the said premises within the boundary lines of said Peterson's land that may be necessary and proper to the successful prosecution of said manufacture, together with the right of taking from the before-described premises timber and stone to erect and keep in repair the establishment therein contemplated. It was also agreed that the said Peterson should be at liberty to lay a railroad near Humes' line, from the coal-bank on the hill to the canal, *provided* it does not interfere with the interests of lessees in the conduct of their works and improvements. It was further agreed that the lease should endure as long as the salt-wells therein contemplated to be established should be carried on by the said Thomas Kier and Samuel M. Kier, the survivor of them or by their assigns. Then followed a

[Kier *v.* Peterson.]

proviso, " that if the said parties of the second part (the Kiers) shall let the salt-wells erected on said premises remain idle or out of use for three continuous years, then the said Peterson shall be at liberty to enter upon possession of said premises as if the lease had never been entered into." Should the said parties of the second part be induced to abandon their works and improvements at any time, they shall be at liberty to remove from the premises all machinery and fixtures, except houses and buildings, connected with the manufacture of salt; and it was further agreed that the salt-wells about to be established shall be in operation within one year from the date of this article, and if delayed two years from the date of this article, said Peterson to take possession as before described.

In consideration of which the said Thomas Kier and Samuel M. Kier agree to pay unto the said Lewis Peterson the one-twelfth barrel of all the salt made on the said premises, to be delivered to the said Lewis Peterson, or his authorized agent, at the works on the said premises, on the first days of January, April, July, and October in each and every year during the continuance of this lease.

It will therefore be perceived that this instrument gave a life estate to the Kiers and the survivor, to endure as long as the salt-wells shall be carried on by them or their assigns, with two conditions, the first of which, as to putting the salt-wells in operation, has been fulfilled, and has therefore no longer any existence, and the second, as to letting the salt-wells remain idle or out of use for three continuous years, has never been broken. In fact it is conceded that all the covenants and agreements of the lessees have been strictly complied with, including the payment of the stipulated rent.

The lessees, therefore, had a freehold estate for life in these premises on condition, without any other restriction or limitation except what is expressly stated on the face of the articles of agreement. Subject only to this, these lessees were tenants for life of this property, and with all the rights belonging to such an estate.

The defendants went into possession of the demised premises, sunk a well in 1839, erected works, and commenced and continued the manufacture of salt; and about 1845 carbon oil, or petroleum, arose in the well in connection with the salt water, and the real question is, to whom does this oil belong, to the lessor or the lessees ? The oil must be separated from the salt water, or the lessees cannot carry on their manufacture of salt, and they are clearly not obliged to keep it if they do not think it expedient, but may let it run into the canal as they did at first.

They are certainly not guilty of either legal or equitable waste, because the well through which the oil reaches the surface was

opened in direct obedience to the stipulations in the lease, and must be continued open and kept in operation in order to prevent a forfeiture, and to enable the lessees faithfullly to pay a fair rent in the stipulated article of manufactured salt, the purified product of this very well.

If mines are already opened, or if the lease permits their being opened, it is not waste for the tenant to work them even to exhaustion. Nor would it be waste to open new shafts or pits to follow the same vein. So as to saltworks: if there is an existing salt-well and works, it would not be waste to dig a new salt-well in connection with it: Findlay v. Smith, 6 Munford 134. There is therefore no charge of waste of any kind against the lessees.

If this had been an open spring, throwing out salt water, and finally petroleum also, could there be any doubt that it would be a part of the accruing profits? So if it had been an open salt-well, would it not be in the same category? What difference, then, is there between these cases and a salt-well opened in express conformity to the articles of agreement? It is the same as if it had been there before the lease was signed.

Petroleum or rock oil is essentially composed of carbon and hydrogen, and is a liquid inflammable substance or bitumen exuding from the earth, and is collected in various parts of the world—on the surface of the water, in wells and fountains, or oozing from cavities in rocks.

In the decomposition of vegetable substances, there are formed besides carburetted hydrogen, exhalations of which are of frequent occurrence in rock salt formations, liquid and solid hydrocarbons, such as naptha and petroleum, or mineral oil, mineral tar.

In Marietta, in the state of Ohio, the inflammable gas is a constant attendant upon brine springs, so that its appearance while boring in search of rock salt is looked upon as an indication of a favourable result; and in China the inflammable gas has been used to boil the brine, and also to heat and light the buildings in which the salt is prepared. On the shores of the Caspian Sea there is a tract called the Field of Fire, which continually emits inflammable gas, while springs of naptha and petroleum occur in the same vicinity.

On the surface of the Dead Sea, which is very salt, asphalte is found in a soft or liquid as well as a solid state, and it is said by high authority that bitumen in small particles hardly visible, but distinguishable by the smell, occurs in all the minerals of the saliferous system.

The presence therefore of petroleum or mineral oil is naturally to be expected in the salt formation west of the Allegheny Mountains, and although its great value has not been fully appreciated until within a few years, still if it comes up as in the present

[Kier *v.* Peterson.]

instance, with the brine of a well which was opened in pursuance of, and must be regularly worked by, the express stipulations of the lease, it must belong to the lessee, who must separate it from the salt, and either let it run to waste or prepare it for the market. This is the evident justice of this case, which can only form the rule for a very small number of possible cases. There is also another consideration. Petroleum frequently contains paraffine, a substance in a pure state resembling spermaceti; but when mingled with a small quantity of petroleum, it assumes the consistence of butter. In this state it would tend to clog the pumps in a salt-well, particularly around the bucket and valves. Upon the whole, we are of opinion that the petroleum which is sought to be recovered in this action was the property of the defendant below, and this renders it unnecessary to consider any of the other questions in the cause.

> Judgment reversed, and judgment entered for the defendant.

THOMPSON, J., dissents.

Concurring opinion delivered, March 27th 1862, by

WOODWARD, J.—I concur in the judgment of the majority, on the ground that the plaintiff's action was misconceived. I hold that trover was not his appropriate remedy. A few words will suffice to exhibit my views.

Petroleum, or, as it is called in the West Indies, Barbadoes tar, is a species of mineral, which, while it exists in its natural deposits in the earth, is included in the very comprehensive idea which the law attaches to the word *land*. It is part of the land. It is land. As such it belonged to Peterson, in the place where the present dispute arose. He held it by the same title by which he held the surface, or the salt which underlay the surface. He was absolute proprietor of all things between the surface and centre of the earth at that place, saving only the government's right to share in the gold and silver that might be found. It was his freehold, and the petroleum and the salt were parts of the freehold.

By the article of agreement of October 30th 1837, he leased the premises to Thomas and Samuel M. Kier, for purposes of salt-wells. Under certain conditions and restrictions the lease was to endure as long as the salt-wells should be carried on by the Kiers, the survivor of them or their assigns. The rent reserved was every twelfth barrel of salt made on the premises. It was in effect and substance a sale of the crude salt in the land for one-twelfth of the manufactured article. Now, there is no doubt that the absolute owner of land may sell a partial interest in it as well as the whole. He may sell the surface and retain the minerals, or he may sell one or more of the minerals and retain

[Kier *v.* Peterson.]

the surface. This is every day's experience in the mining districts.

But it is self-evident that when he carves out a particular interest and sells it, he retains all the rest as absolutely as before he conveyed a part. Therefore I cannot doubt that Peterson was as exclusively and as absolutely the owner of the petroleum in this land after the lease of October 30th 1837 as before. There is not a word in the instrument which imports his intention to part with anything more than the salt in his land, and such timber and stones as should be necessary for erecting and maintaining saltworks. Every matter and thing in, and pertaining to the land which was not conveyed to the Kiers by that instrument was retained by Peterson.

But the Kiers could not exercise their right to raise salt without raising petroleum. They severed both the salt and the petroleum from the freehold, and brought both to their lawful possession at the surface. They were not trespassers. The severance of the petroleum was an inevitable incident of their exercise of clearly granted rights. The grant of the right to take salt was the grant of all incidental rights which were indispensable to the exercise of the main one. Hence, their severance of the petroleum from the freehold, and their possession of it, were lawful. The work of separating the oil and salt was not difficult. With opportunity given them the fluids would separate themselves. But the Kiers, in lawful possession of both before separation, were to control the work of separation, and were in lawful possession of each after that work was accomplished. For this reason I hold the action of trover will not lie. Although Peterson had not lost his right of property in the petroleum, yet a mere right of property in a chattel is not sufficient to maintain trover. The plaintiff must have also the right of possession at the time of conversion: 1 Chit. Pl. 164; Saunders P. & E. 1138. In Mather *v.* Trinity Church, 3 S. & R. 509, the principle was carried further still, and it was held, that trover for stone and gravel dug from land, does not lie by one who has the right of possession, against a person who has actual adverse possession of the land and sets up title to it. In our case, Peterson had no right of possession of the land whatever, and the Kiers were not in as mere adverse holders, but Peterson had conveyed the right of possession to them, and they were in under and according to his title. Nor were they guilty of waste in severing the petroleum from the freehold, since it was an inseparable consequence from the right granted to them by the landlord. Their actual possession, therefore, of the severed chattel, was in every sense a rightful possession, and, because no right of possession existed in Peterson at the moment of severance, trover will not lie.

On this ground alone I am for reversing the judgment. I hold

Peterson entitled to compensation for the value of his oil, and I suppose a bill in equity for account, would be his most natural and efficacious remedy. I think the learned judge below apprehended correctly the measure of compensation. Peterson would not be entitled to the labour of the Kiers, but only to the value of the oil at the instant of separation from the freehold. But his remedy, whatever the extent of it, is to be sought in another form of action.