RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0078p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

THE GRISSOMS, LLC,

                     *Plaintiff-Appellee*,

    *v.*

ANTERO RESOURCES CORPORATION,

                     *Defendant-Appellant.*

> No. 24-3676

———————————

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-02028—Edmund A. Sargus, Jr., District Judge.

Argued:  March 20, 2025

Decided and Filed:  April 2, 2025

Before:  SUTTON, Chief Judge; MOORE and RITZ, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Daniel T. Donovan, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant.
John W. Barrett, BAILEY GLASSER LLP, Charleston, West Virginia, for Appellee.
**ON BRIEF:**  Daniel T. Donovan, John C. O'Quinn, Ragan Naresh, Holly Rioux-Lefebvre,
Saunders McElroy, KIRKLAND & ELLIS LLP, Washington, D.C., Timothy B. McGranor, Ilya
Batikov, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellant.
Logan Trombley, MENDENHALL LAW GROUP, Akron, Ohio, John W. Barrett, BAILEY
GLASSER LLP, Charleston, West Virginia, for Appellee.  John Kevin West, John C. Ferrell,
STEPTOE & JOHNSON PLLC, Columbus, Ohio, for Amicus Curiae.

_____

**OPINION**

_____

SUTTON, Chief Judge.   A certified class of Ohio landowners alleges that a Colorado-based mining company underpaid them $10 million in natural gas royalties.   The district court agreed, and so do we.   We affirm.

I.

For as long as there has been an oil and gas industry, there has been oil and gas litigation, often over royalties.

Consider the story of Samuel M. Kier.   In 1839, Kier, then a salt miner, contracted with Lewis Peterson, who owned salt-rich land near Pittsburgh, Pennsylvania.   *Kier v. Peterson*, 41 Pa. 357, 359 (1862).   Kier mined Peterson's property for salt, and Kier paid Peterson a royalty on the salt proceeds.   *Id.* at 360.   A few years later, Kier discovered oil, "an article of no value" that naturally mixed with the salt underground and "obstruct[ed]" his mining operation.   *Peterson v. Kier*, 2 Pittsburgh 191, 193 (Pa. D. Ct. Sept. 1, 1860).

To rid himself of the oil, Kier dumped it in the Allegheny River.   *Id.*   When the byproduct caught fire, Kier saw opportunity.   *Id.*   Thinking the oil might be used to illuminate homes, he invented the kerosene lamp.   Americans before long preferred the lamp to candles, and Kier's product did well.   *See* Daniel Soeder, *Energy Futures* 38–39 (2022); William R. Brice, *The Oft-Forgotten Oil Pioneer*, 9 Oil-Indus. Hist. 73, 73 (2008).

That takes us back to the landowner, Peterson.   He had a royalty on the salt but not the oil.   He sued Kier for $20,000, generating what has been described as the first recorded oil-and-gas lease lawsuit in American history.   *See* James B. Sayers, *Pennsylvania, 1858–1948*, *in Conservation of Oil and Gas* 425, 425 (1949).   The Pennsylvania Supreme Court ruled that Kier could keep the oil proceeds based on the "express stipulations of the lease," which required him to separate the oil from the salt and entitled Peterson only to proceeds from the salt.   *Kier*, 41 Pa. at 362.

Mindful of Peterson's example, landowners and miners ever since have tried to craft oil-and-gas royalty agreements that fairly allocate the relevant benefits and burdens.

That brings us to this case. Antero Resources Corporation mines for oil and gas. It reached agreements with 370 Ohio landowners, whose land covers large swaths of Noble and Monroe Counties, to mine their property for oil and many types of gases. The key objects of the leases, which all follow a similar template, were a variety of gases, the most abundant (and profitable) product in this part of the shale deposit.

Before turning to the lease, a brief discussion of Antero's operation is in order. Natural gas miners must consider how to pull the gas from the ground, how to process the gas, and how to transport it to buyers. Transportation usually requires a pipeline from the well to a processing facility. No such facilities existed near these landowners. To solve that problem, Antero created a joint venture with its subsidiary, Antero Midstream Corporation, and MarkWest Utica EMG, LLC. Under the joint venture, Antero would build wells to mine the natural resources, Antero Midstream would build pipelines to transport the gas from the well, and MarkWest would build a custom factory to process the gas. After the companies built these facilities, the mining and processing operation progressed in three stages.

At the first stage, Antero pulls a mixture of water, sand, oil, and various gas products through the wellbore (the hole drilled through the ground) to the wellhead (the surface equipment). The mixture flows out of the wellhead to nearby equipment that filters out the sand and separates the resulting mixture into three streams: crude oil, unrefined gas (methane and other gas products), and water. Antero sells the crude oil at this stage, transporting it off lot via truck for sale. Antero pays landowners royalties on these oil sales. The company also disposes of the sand and water at this point.

At the second stage, Antero's subsidiary, Antero Midstream, gathers the unrefined gas from each well on the lot into a "gathering pipeline," compresses the gas, dehydrates it, and transports it off-site to MarkWest's processing plant. R.85-3 at 43. Antero pays MarkWest for "processing," which involves separating the gas mixture into purified natural gas (mostly methane) and a mixture of various other gas products (known as "Y-Grade"). R.85-3 at 21, 23.

Antero sells the purified natural gas to downstream markets via a transmission pipeline that distributes it nationwide.  Antero pays landowners royalties on these (largely methane) gas sales.

At the third stage, MarkWest gathers the non-methane gas mixture and transports it to other facilities.  At these facilities, Antero pays MarkWest for "fractionation," which separates the gas mixture into its component parts: ethane, propane, butane, and natural gasoline, typically.  R.85-3 at 15.  Antero sells these purified gases by train or pipeline.  Antero separately pays landowners royalties for these sales.

Under the leases, signed in 2012, the landowners granted Antero the exclusive right to mine their land for oil and gas for five years, or longer if Antero "is conducting operations for oil and gas."  R.15-1 at 5–6.  Antero received an option to extend the lease with the same terms at its sole discretion for three years.  In exchange, Antero offered each landowner the same deal:  an upfront payment per acre and a royalty on all of the oil and gas products it sold.  The lease permits Antero to sell only "oil, gas, and other liquid and gaseous hydrocarbons produced through a well bore."  R.15-1 at 5.  It expressly excludes all other natural resources including "sulfur, coal, lignite, uranium and other fissionable material, geothermal energy, base and precious metals, rock, stone, gravel, and any other mineral substances."  R.15-1 at 5.

The lease's royalty provision requires Antero to pay royalties to the landowners based on the "gross proceeds" of all the resources it mines from the lots.  R.15-1 at 6.  It pays a 21% royalty on the oil products, including "oil, other liquid hydrocarbons and by-products produced from or on the Leasehold Estate and sold by" Antero.  R.15-1 at 6.  The lease likewise pays a 21% royalty on the various gas products, including "gas and other hydrocarbons and by-products produced from or on the Leasehold Estate and sold by" Antero.  R.15-1 at 6.  The lease calculates gross proceeds (and the royalties) based on the price at which Antero or its affiliates sell the products.  In line with this provision, Antero pays landowners royalties based on the three categories of products it sells: "OIL" royalties, "GAS" royalties, and "PPROD" (plant product) royalties.  R.1-3 at 1–3.  Proceeds from the natural gas and other gas products are more profitable for Antero (and so too for the landowners) than proceeds from the oil.

A "Market Enhancement Clause" in each lease permits Antero to deduct some value-enhancing costs from the landowners' royalty payments. R.15-1 at 6. But the same clause says that Antero may not deduct the costs of "transform[ing] the product into marketable form." R.15-1 at 6.

Antero deducted three costs from the landowners' royalties: the "processing" costs of separating purified natural gas from the remaining non-methane gas mixture (the "Y-Grade"), the "fractionation" costs of isolating each discrete gas from that mixture, and the transportation costs of distributing the final products.

One of the landowners, The Grissoms, LLC, filed a class action against Antero on behalf of the other landowners for breach of contract. It claimed that Antero wrongly deducted from its royalties "processing" and "fractionation" costs. The Grissoms did not dispute the oil royalties, and it did not dispute Antero's deductions for the costs of transporting each product to its final buyer.

Antero counterclaimed for declaratory relief, seeking authority to deduct the stage two costs its subsidiary incurred gathering, dehydrating, compressing, and sending the unrefined natural gas from the lot to MarkWest's processing factory.

The district court certified a class of affected landowners. Antero and the landowners moved for summary judgment on liability. The district court denied Antero's motion and granted the landowners' motion. After this ruling, the parties stipulated that the damages for the breach amounted to $10 million, and the district court entered a final judgment.

II.

At stake is whether Antero properly deducted from the landowners' royalties the costs to "process" the natural gas (separating methane from the other gas products) and to "fractionate" the remaining gas products (separating the non-methane gas into its constituent parts). Under Ohio law, which governs the lease, the "terms of the written instrument" determine which costs, if any, a miner may deduct from a landowner's royalty payments. *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016) (quotation omitted).

The lease contains a royalty provision that promises the landowners a 21% royalty on gross proceeds of the oil products, gas products, and "other hydrocarbons" produced on the lots. R.15-1 at 6. Gross proceeds turn on the price Antero or its affiliates receive for the products. That provision does not permit Antero to deduct any costs from royalty payments. A different provision, called the Market Enhancement Clause, permits some deductions.

It reads in full:

C) Market Enhancement Clause. It is agreed between the Lessor and Lessee that, notwithstanding any language contained in A) and B) above, to the contrary, all royalties or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be proportionally deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price per unit that is less than the price per unit received by Lessee.

R.15-1 at 6.

This clause allows Antero to deduct from the landowners' royalties "any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price." R.15-1 at 6. Not all value-enhancing costs are deductible. Antero may deduct costs only from "marketable" products. R.15-1 at 6. Even if a cost enhances a marketable product, Antero may not deduct that cost if it is required to make another product—a transformed product—marketable. In the lease's words, Antero may not deduct "the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form." R.15-1 at 6.

A transformed product is "marketable" when it is "[o]f commercially acceptable quality; fit for sale and in demand by buyers," Black's Law Dictionary 1057 (9th ed. 2009), or "[f]it to be offered for sale, as in a market," American Heritage Dictionary 1075 (5th ed. 2011). Recall that Antero sells the landowners' resources as crude oil and many types of gases. At stage one,

Antero sells crude oil from the wellhead via truck and pays "OIL" royalties. At stage two, it sells refined natural gas (methane) from its joint-venture factory to interstate pipelines and pays "GAS" royalties. At stage three, it sells the disaggregated other gases (ethane, propane, butane, and natural gasoline) from various processing plants via railcar or pipeline and pays "PPROD" (plant product) royalties. The oil, gas, and other products first become marketable when they can be sold in crude oil markets, refined gas markets, ethane markets, and so on.

In applying the lease to this operation, the key question is whether Antero may deduct "processing" and "fractionation" costs from the landowners' royalties that occur at stage two and stage three of the operation. We consider each in turn.

*Processing costs.* At stage two, Antero and its affiliates separate the methane from the non-methane gases. In doing so, they "transform" the aggregated "gas and other products" (methane, ethane, propane, butane, and natural gasoline) into its first "marketable form." R.15-1 at 6. While there is an existing market and a futures market for methane, there are no such markets for a methane-ethane-propane-butane-natural gasoline mixture of unknown proportions. Separating the non-methane gases from the methane is essential to transform one gas product (purified methane) into marketable form. Transmission pipelines, notably, do not accept natural gas with too many non-methane gas products. Antero thus purifies the mixture of various gases for sales of methane through these pipelines. Only after stage two, not stage one, does this marketable product come into creation.

If the mixture of various gases *were* marketable at the wellhead, moreover, one would have expected Antero to deduct the stage two costs of transporting the mixture to the processing facility. But Antero did not. At this point, all agree that Antero *must* pay the transportation costs from the wellhead to the stage two processing operation, suggesting that stage two transformed the gas mixture into methane, which became a marketable product at that point.

*Fractionation costs.* That leaves the stage three "fractionation" costs of separating the various non-methane gas products from each other. Separating ethane, propane, butane, and natural gasoline from this mixture is an essential part of transforming the "other products"

(ethane, propane, butane, and natural gasoline) into marketable form. Antero may not deduct these costs either.

The unseparated Y-Grade mixture of various gases is not suitable for buyers in the main. Only after Antero and its affiliates separate the streams may the products be transported to "downstream end users." R.85-3 at 15. Without fractionation, the Y-Grade is a mixture of several gases of unknown quantity. Antero has not presented any evidence that this unseparated product is a commodity that a traditional end user would find useful. So far as the record shows, there is no established market for "Y-Grade" mixture, as opposed to, say, butane and natural gasoline.

Processing the unrefined gas mixture into methane, ethane, propane, butane, and natural gasoline more naturally fits under the heading of transformation than enhancement. The term "transform" means "[t]o alter markedly the appearance or form of," or "[t]o change the nature, function, or condition of." Webster's II New College Dictionary 1170 (2001). To "enhance" is "[t]o increase or make greater, as in value, beauty, or reputation." *Id.* at 374. Activities like "processing," "gathering," and "separating" are more indicative of transformations than enhancements. Enhancements suggest an existing market and the goal of making a product within that market more valuable.

The text of the lease, the various forms of gas products covered by the lease, and the market realities of this operation all show that "processing" and "fractionation" are essential parts of transforming the unrefined gas into marketable natural gas and of transforming the Y-Grade non-methane gas mixture into marketable gas products (ethane, propane, butane, and natural gasoline). Antero thus may not deduct these costs from the royalties.

We and the district court are not the only ones to come to this conclusion. The Fourth Circuit recently faced a dispute about the same requested deductions in the very same royalty agreement with the very same defendant. *Corder v. Antero Res. Corp.*, 57 F.4th 384, 388 (4th Cir. 2023). Antero sought to deduct all stage two and stage three costs that it incurred after separating the mixture of various gases from the crude oil, water, and sand at the wellhead. *Id.* at 398. It argued that the unprocessed gas mixture created after stage one was a "marketable

product" and claimed that the stage two and three costs of separating all the gases merely enhanced the product. *Id.* at 398–99.

The Fourth Circuit ruled for the landowners and rejected Antero's arguments. It noted that the definition of "product" suggested "an item that has passed through a chain of commercial distribution before ultimate use or consumption," not an unfinished good. *Id.* at 399 (quotation omitted). It reasoned that the identical Market Enhancement Clause referred to plural "products" ("oil, gas and other products"), suggesting "that Antero may produce and sell many different types of products derived from natural gas." *Id.* at 399–400. And it concluded that the purified methane gas and various gas products "first bec[a]me marketable when they [we]re separated" from each other—after processing and fractionation. *Id.* at 401 n.11. We agree.

### III.

Antero sees things differently. It believes that the relevant "product" is the combined gas-oil-water-sand mixture that it pulls from the ground. And it believes this "product" to be marketable as soon it separates the crude oil, sand, water, and gas mixture at the wellhead, making any other costs deductible enhancement costs.

But the lease, to repeat, contemplates multiple "products"—hence the reference to the "oil, gas and other products produced"—and precludes Antero from charging the landowners for the costs of "transform[ing]" these products "into marketable form." It does not contemplate just one aggregated gas stream for sale. Antero's own royalty invoices recognize as much, as they label separate payments for "OIL," "GAS," (purified methane) and "PPROD" (the discrete non-methane gas products). Plus, the lease never uses "at the wellhead" language or anything like it, which one would expect if that is what the parties contemplated.

Even if we could credit a sale to a hypothetical middleman who might buy and purify the gas mixture itself, we ordinarily do not think of sales to intermediaries when we ask whether a good is fit for sale. One could imagine a buyer for just about any work-in-progress product. Antero has not identified any meaningful, sizeable, commercial market for this unrefined gas.

Antero protests that, under our interpretation, most of the enumerated costs could never be considered deductible value-enhancing costs and thus the phrase "such costs" covers little more than transportation. We see the point. But in the context of this royalty provision, that reality does not give us equal pause. The provision entitles the landowners to all "gross proceeds," subject to a narrow exception, allowing deductions for certain value-enhancing costs. Further narrowing the exception is the reality that it applies only after a product becomes "marketable." Antero's reading of "such costs" would make all costs deductible after Antero separates the oil, gas, water, and sand. In substance and form, that would be an "at the wellhead" royalty, and no one claims the parties entered such an all-or-nothing-at-all agreement.

Antero adds that the unrefined gas mixture at the wellhead is a "marketable product" because it is theoretically "capable of being sold." Appellant's Br. 4. Anything sellable, it maintains, therefore must be marketable. But, in context, the language of the lease does not contemplate such a broad reading of "marketable" product. That reading would transform the lease into an "at the wellhead" lease, yet one without any such language. And that reading would eviscerate the "transform" and "products" language elsewhere in the lease.

Antero insists that this approach unfairly imposes costs on it by looking to when the company "marketed" each product rather than when the products were "marketable." Appellant's Br. 16. Not so. All agree that the landowners must contribute to the transportation costs of each finished product, no matter if it is sold at the wellhead (like the crude oil), at the pipeline (like the refined natural gas), or elsewhere (like the other various gases). Were Antero able to spend more money on the crude oil, natural gas, or other discrete gas products to enhance their value, it could deduct those costs. One could imagine Antero deducting storage costs if later sales would increase the value of these goods in an existing market. The same goes for late-stage marketing—such as advertising the finished goods to potential buyers.

Antero claims that our interpretation conflicts with our prior decision in *Zehentbauer*, in which we interpreted "marketable product" to mean one "capable of being marketed" by the miner, not "a finished by-product." *Zehentbauer Fam. Land, LP v. TotalEnergies E&P USA, Inc.*, No. 20-3469, 2022 WL 294081, at *3 (6th Cir. Feb. 1, 2022) (quotations omitted). But that lease expressly contemplated that the miner would sell the combined oil-and-gas mixture "at the

wellhead." *Id.* The parties agreed by contract that the mixture was "marketable" at that point, and the miner in fact sold it there. *Id.* at *1–2. Our interpretation of "marketable product" underscored only that the miner was not "capable" of marketing finished byproducts because there were no "marketable by-products produced from the leased premises." *Id.* at *1–3. The oil and gas were sold as-is from the lot. *Id.*

Antero suggests that this interpretation conflicts with two decisions that distinguish "production" from "postproduction" costs by looking to the point when the gas is first produced at the wellhead, one decision by the Western District of Louisiana and another by the Ohio Supreme Court. But these cases describe the "at the wellhead" approach, which obligates the miner to bear only the costs of pulling the oil and gas from the wellhead. *J. Fleet Oil & Gas Corp., L.L.C. v. Chesapeake La., L.P.*, No. CV-15-2461, 2018 WL 1463529, at *8 (W.D. La. Mar. 22, 2018) (noting that Texas and Louisiana both "recognize the general rule that post-production costs are shared *pro rata* unless a lease says otherwise"); *Lutz*, 71 N.E.3d at 1011 (describing the certified question of whether "Ohio follow[s] the 'at the well[head]' rule"). It would be odd to presume this default rule applies when the Ohio Supreme Court expressly rejected any such presumption. *Lutz*, 71 N.E.3d at 1012–13. This lease, to repeat, does not use "at the wellhead" language or something equivalent.

To the extent Antero claims that this lease alludes to a default rule, the terms "marketable" and "products" in the lease suggest that it should be construed more like the "marketable product" rule than the "at the wellhead" rule. The "marketable product" approach, it is well to remember, obligates the *miner* to bear the costs of making a product sellable in "a free and competitive market." *Pummill v. Hancock Expl. LLC*, 419 P.3d 1268, 1278 (Okla. Civ. App. 2018); *see Rogers v. Westerman Farm Co.*, 29 P.3d 887, 906 (Colo. 2001) (recognizing the rule that a product is "marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace"). As we have explained, the record does not support Antero's position that any such market exists for the wellhead gas produced here.

Antero argues that we should not rely on the Fourth Circuit's opinion in *Corder* because the state law at issue in that case, West Virginia law, construes oil-and-gas contracts in favor of landowners. But it's doubtful that this rule of construction had a meaningful impact on the case.

The court characterized the Market Enhancement Clause as unambiguous seven times.  *See Corder*, 57 F.4th at 398–401.  It made only one passing reference to West Virginia's pro-landowner rule (in an explanatory parenthetical, no less) to rebut Antero's alternative understanding of the provision.  *Id.* at 399.  Even if that court relied on this rule, Antero still faces a problem.  Ohio has its own rule of construction:  "[A] contract is to be construed against the party who drew it."  *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996).  While this contract says that both parties participated in writing it, no evidence shows that the 370 landowners (who all signed similar contracts) had any role in drafting the shared Market Enhancement Clause.

For these reasons, we affirm.