No. 23-589, *Jacklin Romeo, Susan S. Rine, and Debra Snyder Miller v. Antero Resources Corporation*

BUNN, Justice, dissenting:

I disagree with the majority's opinion in this case. While I do not seek to wholly abandon more than two decades of precedent set forth in *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and expanded in *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 219 W. Va. 266, 633 S.E.2d 22 (2006),[1] I instead would have answered the first certified question from the United States District Court for the Northern District of West Virginia narrowly, based upon the reasoning underlying *Wellman* and *Tawney*'s outcomes at the time they were decided and in consideration of the facts giving rise to those decisions, rather than reading their syllabus points standing alone, as the majority appears to do. *See State v. McKinley*, 234 W. Va. 143, 149, 764 S.E.2d 303, 309 (2014) (acknowledging that an opinion's "syllabus is not intended to be an exhaustive recitation of every item decided in the case, and must be read in light of the opinion as a whole"); *see also Romeo v. Antero Res. Corp.*, ___ W. Va. ___, ___, ___ S.E.2d ___, ___ (2025) (Walker, J., dissenting) (also quoting *McKinley*). In answering the first certified question, I would have interpreted *Wellman*, and particularly its point of sale language in

___

[1] I agree with much of Justice Walker's well-reasoned dissent in this case where she advocates for overruling our holdings in *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 219 W. Va. 266, 633 S.E.2d 22 (2006). *See Romeo v. Antero Res. Corp.*, ___ W. Va. ___, ___, ___ S.E.2d ___, ___ (2024) (Walker, J., dissenting). However, rather than fully overruling those cases, as I explain here, I would interpret them based upon their historical underpinnings and applicable facts.

1

Syllabus points 4,[2] to mean that oil and gas lessees must bear costs only until the oil or gas reaches the first available point of sale where it *can* be sold—not to the location where the oil or gas is *actually* sold. I would have declined to answer the second certified question regarding natural gas liquids ("NGLs"), as the question requires the interpretation of the leases' language, and, given that I would have modified *Wellman* and *Tawney* rather than expand them as the majority has done, the factual determinations of marketability are not answerable in the context of this certified question and the facts presently before this Court.

Ultimately, I would not leave West Virginia as a minority of one, where oil and gas lessees pay all costs to the actual point that the oil or gas—or byproducts—are actually sold.[3] The majority's opinion extends *Tawney*'s "gap filler" provisions, purportedly related to the implied covenant to market, to such an extent that the right to freely contract is not only inhibited, but fully incapacitated by the requirement that the contracting parties must use magic words and clairvoyance to memorialize their arms-length transactions. *See SWN Prod. Co., LLC v. Kellam*, 247 W. Va. 78, 98, 875 S.E.2d 216, 236 (2022) (Walker, J., dissenting).

---

[2] "If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." Syl. pt. 4, *Wellman*, 210 W. Va. 200, 557 S.E.2d 254.

[3] *See* Byron C. Keeling, *In the New Era of Oil and Gas Royalty Accounting: Drafting A Royalty Clause That Actually Says What the Parties Intend It to Mean*, 69 Baylor L. Rev. 516, 541 (2017) (recognizing that "West Virginia has adopted perhaps the most extreme version of the first marketable product doctrine").

### A.     The First Certified Question: The Duty to Market and The First Marketable Product

In its first certified question, the district court asks whether the requirements of *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), and *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 219 W. Va. 266, 633 S.E.2d 22 (2006), "extend only to the 'first available market' as opposed to the 'point of sale' when the duty to market is implicated[.]" While the majority interprets *Wellman*, particularly Syllabus point 4, to provide that all expenses must be borne by the lessee until the product is actually sold, the discussion of "point of sale" and "marketable" in *Wellman* and its progeny contradicts that interpretation, instead indicating that when the Court originally considered the issues in *Wellman*, the duty to market was only to make a product marketable, not sold. In answering the district court's first certified question—which essentially concerns the scope of the duty to market—I would have considered our prior case law in light of the facts present here. Throughout our oil and gas jurisprudence, the Court has explained the origins of oil and gas lessees' duty to market—what it means, how it arose, how it is interpreted, and how it can be express or implied. But an examination of the underpinnings of our case law reveals the Court's repeated emphasis on the role of the lessee in getting a product to a *marketable* condition and to *a* point of sale—not, necessarily, sold. The majority's position that a lessee discharges its duty to market only by completing the sale of the product (and, in turn, a lessee bears all costs to that point) ignores the history and foundation underlying the relevant opinions.

"Initially, the implied covenant to market was only concerned with the *diligence* of marketing and not the *expense* of marketing, which came later." Thomas C. Jepperson & Michael B. McGinley, *The "Marketable Location" Rule and Energy Policy Considerations*, 24 J. Land Res. & Env't L. 323, 325 (2004) (emphasis in original). This Court extensively discussed the duty to market in *Wellman*, when considering a ten-year lease where the lessee agreed to pay "'1/8th of the proceeds from the sale of gas as such at the mouth of the well where gas, condensate, distillate, or other gaseous substance is found' when the gas produced was sold as natural gas." 210 W. Va. at 209, 557 S.E.2d at 263. The lessee received $2.22 per thousand cubic feet of gas, yet it only calculated royalties based on $.87 per thousand cubic feet of gas, because it deducted "certain expenses" in its calculation of the value of the gas. *Id*. The lessor alleged that the lessee failed to pay proper royalties, while the lessee claimed that it should have been allowed to deduct certain expenses. *Id*. at 204-05, 557 S.E.2d at 258-59.

Finding in favor of the lessors and discussing a lessee's duty to market oil and gas, the *Wellman* Court recognized the one-eighth "landowner's royalty," a type of royalty that was "widely adopted in the United States" and was "not chargeable with any of the costs of discovery and production." 210 W. Va. at 209-10, 557 S.E.2d at 263-64 (citing *Davis v. Hardman*, 148 W. Va. 82, 133 S.E.2d 77 (1963)). However, the Court explained that oil and gas lessees attempted to circumvent the "rule that the lessee must pay the costs of discovery and production," and sought to charge royalty owners with expenses to both

4

transport oil and gas "to a point of sale" and to treat or alter the oil and gas "to put it in a marketable condition," with the lessees calling these costs collectively "post-production expenses." *Id.* at 210, 557 S.E.2d at 264. The *Wellman* Court recognized that the rationale behind forbidding the deduction of those costs arises from the lessee's express or implied duty "to market the oil or gas produced." *Id.* This reasoning "embraces the responsibility to get the oil or gas *in marketable condition* and actually transport it to market." *Id.* (emphasis added).

The *Wellman* Court noted with approval certain other states' approaches to this implied duty to market, using similar "marketable" language. As the Court observed, the Colorado Supreme Court in *Garman v. Conoco*, 886 P.2d 652 (Colo. 1994), found that under a lessee's implied covenant to market produced oil and gas, "it had the duty to bear the cost of preparing the oil and gas for market and to pay the cost of transporting them to market."[4] *Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264 (discussing *Garman*'s

_____

[4] In their supplemental brief, the petitioners argue that the Colorado Supreme Court abandoned *Garman*'s "first available market" rule when it issued *Rogers v. Westerman Farm Co.*, 29 P.3d 887 (Colo. 2001), *as modified on denial of reh'g* (Aug. 27, 2001), shortly before the West Virginia Supreme Court of Appeals issued the *Wellman* opinion. While neither *Wellman* nor *Garman* use the phrase "first available market," *Rogers*, rather than abandoning the first-marketable product rule, refined marketability and cost allocations for Colorado, recognizing the following:

> in defining marketability under the implied covenant to market, we look to the first-marketable product rule for guidance. Gas is marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace. The

5

reasoning); *Garman*, 886 P.2d at 659 ("In our view the implied covenant to market obligates the lessee to incur those post-production costs necessary to place gas in a condition acceptable for market. Overriding royalty interest owners are not obligated to share in these costs."). In its analysis, the *Wellman* Court discussed, with approval, Kansas and Oklahoma's rationale behind their adopted implied duty to market, quoting *Garman*'s citations and quotations of certain cases from those states. *Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264. Specifically, as noted in *Wellman*, *Garman* recognized the Oklahoma Supreme Court's previous determination that "[T]he implied duty to market means a duty to get the product to the place of sale in marketable form." *Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264 (alteration in original) (quoting *Garman*, 886 P.2d at 658, which quoted, in turn, *Wood v. TXO Production Corp.*, 854 P.2d 880, 882 (Okla. 1992)). *Wellman* also acknowledged *Garman*'s recognition of the Kansas case, *Gilmore v. Superior Oil Company*, 388 P.2d 602, 606 (Kan. 1964), which stated "Kansas has always recognized

---

determination of whether gas is marketable is a question of fact, to be resolved by a fact finder.

Once gas is deemed marketable based on a factual determination, the allocation of all costs can properly be determined. Absent express lease provisions addressing allocation of costs, the lessee's duty to market requires that the lessee bear the expenses incurred in obtaining a marketable product. Thus, the expense of getting the product to a marketable condition and location are borne by the lessee. Once a product is marketable, however, additional costs incurred to either improve the product, or transport the product, are to be shared proportionately by the lessor and lessee. All costs must be reasonable.

29 P.3d at 906.

the duty of the lessee under an oil and gas lease not only to find if there is oil and gas but to use reasonable diligence in finding a market for the product." *Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264 (quoting *Garman*, 886 P.2d at 658).[5]

In determining what, if any, of these post-production costs must be paid by the lessee alone, and citing the decisions by Colorado, Kansas, and Oklahoma approvingly, the *Wellman* Court recognized that in West Virginia, "a lessee impliedly covenants that he will market oil or gas produced." *Id.* at 211, 557 S.E.2d at 265 (citing Robert Tucker Donley, *The Law of Coal, Oil and Gas in West Virginia and Virginia* §§ 70 & 104 (1951)). Furthermore, because a lessee must bear the covenant's costs, "the lessee should bear the costs associated with marketing products produced under a lease." *Id.* Following this analysis, the Court held that "[i]f an oil and gas lease provides for a royalty based on

---

[5] The Oklahoma Supreme Court in *Wood v. TXO Production Corp.* addressed a certified question regarding whether a lessee may deduct gas compression costs from a royalty interest, and explained that "the implied duty to market means a duty to get the product to the place of sale in marketable form," or, in other words, the "lessee's duty to market . . . include[s] the cost of preparing the gas for market." 854 P.2d 880, 882 (Okla. 1992), *as corrected on limited grant of reh'g* (Okla. May 24, 1993). Meanwhile, the Kansas Supreme Court in *Gilmore v. Superior Oil Co.* considered the allocation of costs for a compression station, where pipelines were "already existing on the leases in question," so the court did "not consider that the lessee was put to any great expense in building miles of pipelines for that purpose." 388 P.2d 602, 606 (Kan. 1964). In its determination and in considering the allocation of costs, the Kansas court focused on the duty to "make the gas marketable" *Id.* at 607. Finally, the *Garman* court specifically determined that the additional costs after "obtaining a marketable product" could be charged against the royalty owners, with the burden on the lessee to show those costs are reasonable "and that actual royalty revenues increase in proportion with the costs assessed," although the Colorado court did not weigh in on the reasonableness of the costs there. *Garman v. Conoco*, 886 P.2d 652, 661 (Colo. 1994).

7

proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." Syl. pt. 4, *id*.[6]

In *Tawney*, published five years after *Wellman*, the Court answered a certified question regarding whether "at the well" or "at the wellhead" language in a lease indicates that the lessee may deduct reasonable and incurred post-production expenses from royalties. *Tawney*, 219 W. Va. at 269, 633 S.E.2d at 25. There, the lessee deducted costs relating to the lessee's

> delivery of gas from the well to the Columbia Gas Transmission ("TCO") point of delivery, [the lessee's] processing of the gas to make it satisfactory for delivery into TCO's transportation line, and losses of volume of gas due to leaks in the gathering system or other volume loss from the well to the TCO line

---

[6] The *Wellman* Court also issued Syllabus point 5, relating to the deduction of reasonable expenses from royalties:

> If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were reasonable. Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable.

210 W. Va. 200, 557 S.E.2d 254.

without disclosing on accounting statements that it took those deductions before calculating royalties. *Id.* The Court found that the "'wellhead'-type language" in the lease was ambiguous and construed the lease against the drafter. *Id.* at 273-74, 633 S.E.2d at 29-30. In construing the lease, the *Tawney* Court determined that "if the drafter of the leases below originally intended the lessors to bear a portion of the transportation and processing costs of oil and gas," the lease could have included "specific language which clearly informed the lessors exactly how their royalties were to be calculated and what deductions were to be taken from the royalty amounts for post-production expenses." *Id.* The *Tawney* Court then held, in Syllabus points 10 and 11, that any lease language allocating costs to a lessor had to be extremely specific to allow "costs incurred between the wellhead and the point of sale" to be deducted from royalties.[7] Syl. pts. 10 & 11, *id.* Syllabus point 10 also addressed these costs as post-production costs. Syl. pt. 10, *id.*

---

[7] Syllabus points 10 and 11 of *Tawney* read as follows:

> 10. Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

> 11. Language in an oil and gas lease that provides that the lessor's 1/8 royalty (as in this case) is to be calculated "at the well," "at the wellhead," or similar language, or that the royalty is "an amount equal to 1/8 of the price, net all costs beyond the wellhead," or "less all taxes, assessments, and adjustments" is ambiguous and, accordingly, is not effective to

9

In reaching this conclusion, however, the *Tawney* Court relied on *Wellman*, again emphasizing the lessee's duty to make a product marketable: "In *Wellman*, [the Court] expressly recognized the general duty of a lessee *to market* the oil or gas produced." *Tawney*, 219 W. Va. at 271, 633 S.E.2d at 27 (emphasis added). The *Tawney* Court further quoted the language from *Wellman* that the "rationale" regarding the express or implied duty to market "embraces the responsibility to get the oil or gas in marketable condition and actually transport it to market." *Id.* (quoting *Wellman*, 210 W. Va. at 210, 557 S.E.2d at 264). Relevant here, while the *Tawney* syllabus points used the term "point of sale," the *rationale* supporting the duty to market does not include any requirement that the products must be transported to the point where a sale is *completed*.

Furthermore, the Court recently interpreted *Wellman*'s Syllabus points Four and Five to mean that West Virginia is "firmly cemented . . . as a '*marketable* product rule' state, meaning that the lessee bears all post-production costs incurred until the product is *first rendered marketable*, unless otherwise indicated in the subject lease." *Kellam*, 247 W. Va. at 83, 875 S.E.2d at 221 (emphasis added) (answering a certified question as to whether *Tawney* was "still good law in West Virginia"). As the Colorado Supreme Court explained, this "first-marketable product rule" provides that "the point where a marketable

---

permit the lessee to deduct from the lessor's 1/8 royalty any portion of the costs incurred between the wellhead and the point of sale.

219 W. Va. 266, 633 S.E.2d 22.

10

product is first obtained is the logical point where the exploration and production segment of the oil and gas industry ends, is the point where the primary objective of the lease contract is achieved, and therefore is the logical point for the calculation of royalty." *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 904 (Colo. 2001), *as modified on denial of reh'g* (Aug. 27, 2001) (quoting Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically, Part 2*, 37 Nat. Res. J. 611, 637 (1997)).

When reading the *Wellman* decision as a whole, not just reading Syllabus point 4 standing alone, the Court created the implied duty to market by considering and adopting its sister states' explanation of that duty. The *Wellman* decision and the authority upon which it relies plainly meant that lessees must bear expenses, whether under the express or implied duty to market, until the product is in a marketable condition, not until the product is actually sold. The language and reasoning used in *Wellman*, and later in *Tawney* and *Kellam*, regarding the *justification* for the implied duty to market also complies with the plain language definition of the term marketable, which Merriam-Webster's Dictionary defines, as its first meaning, as "fit to be offered for sale in a market." Merriam-Webster Online, https://www.merriamwebster.com/ dictionary/marketable.

At the time the Court decided *Wellman* and *Tawney*, the Court was not faced with the facts underlying the certified questions the Court considers in this case. The oil

11

and gas industry has changed considerably since this Court issued those decisions and nowhere in *Wellman* and *Tawney* does the Court indicate that, like here, unsold gas is transferred far outside of Appalachia and undergoes multiple stages of processing. The Court has often stated that "the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." *Morningstar v. Black & Decker Mfg. Co.*, 162 W. Va. 857, 872, 253 S.E.2d 666, 674 (1979), *holding modified by Shears v. Ethicon, Inc.*, 250 W. Va. 226, 902 S.E.2d 775 (2024) (quoting *Dippel v. Sciano*, 155 N.W.2d 55, 62 (Wis. 1967)).[8] And, over time, the Court has had "the opportunity to reflect upon the continued validity of this Court's reasoning in the face of juridical trends that call into question a former opinion's current soundness." *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 231 W. Va. 470, 481, 745 S.E.2d 508, 519 (2013).

While I recognize the importance of precedent and stare decisis, this Court should not stretch holdings and syllabus points to absurd results, as the majority does here. The discussion of "point of sale" and "marketable" in *Wellman* and its progeny indicates that when the Court originally considered the issues in *Wellman*, the rationale supporting the duty to market prioritized making a product marketable, not necessarily sold. While I

---

[8] This Court has recognized that "when it clearly is apparent that an error has been made or that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted." *Woodrum v. Johnson*, 210 W. Va. 762, 766 n.8, 559 S.E.2d 908, 912 n.8 (2001) (internal quotations and citations omitted). Yet, the Court has also recognized "that *stare decisis* does not require this Court's continued allegiance to cases whose decisions were based upon reasoning which has become outdated or fallen into disfavor." *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 231 W. Va. 470, 479, 745 S.E.2d 508, 517 (2013).

do not wholly reject the Court's prior opinions in *Wellman* and *Tawney*, I would have refined the meaning of "point of sale," in syllabus points in *Wellman* and *Tawney*, and modified those holdings to clearly reflect the broader context of our jurisprudence and that of our sister states.

The implied covenant to market, recognized in *Wellman* and further expanded in *Tawney*, "'is a tool utilized to resolve contractual ambiguities'" and a "'gap filler[]' to effectuate the parties' intentions in forming the contract when the contract is silent on a particular issue." *Kellam*, 247 W. Va. at 86, 875 S.E.2d at 224 (quoting *Leggett v. EQT Prod. Co.*, 239 W. Va. 264, 275, 800 S.E.2d 850, 861 (2017), *superseded by statute*, W. Va. Code § 22-6-8(e) (eff. 2018), *as recognized in Kellam*). Yet, by requiring that lessees pay all costs through the actual sale of gas or its products, with no consideration of what the contracts do (or do not) contemplate, the majority has expanded this gap filler so broadly that it ignores the implied covenant's original purpose and erodes the freedom to contract to near non-existence in the context of oil and gas leases.

Even in its discussion of the words "marketing" and "marketable," the majority appears to purposefully obfuscate the Court's original discussion in *Wellman*, which was quoted in *Tawney*, and later explained in *Kellam.* The majority twists the meaning of the word marketable to mean actually sold.[9] The majority's expanded

---

[9] The Court's lack of flexibility in *this* case regarding the meaning of "point of sale" is, practically, converse to the Court's construction of these syllabus points in

13

construction of marketability to mean an actual "point of sale" leads to potentially ludicrous consequences, such as a lessee bearing all costs for transporting and converting products from a well into something entirely different such as plastics, while still having to pay lessors a percentage of the sale price, all without that situation being contemplated or bargained for in the lease. Put another way, the majority attempts to ride a horse and buggy on the interstate. Under the majority's approach, where is the logical end for a producer's duty to bear all the costs—or is there one?

The majority's reasoning in answering the first certified question appears to be "because we've always done it that way," as the majority interprets the Court's prior case law to mean that that lessees must pay costs until the actual sale of the oil, gas, or byproducts, rather than at the first available point of sale, contending that history mandates this interpretation and ultimate result.[10] *See* Maj. op. at 14. This approach rejects a good

_____

another oil and gas decision made this term, also on rehearing, *Kaess v. BB Land, LLC*, No. 23-522, ___ W. Va. ___, ___ S.E.2d ___ (2024). In *Kaess*, the Court interpreted the wording of *Wellman*'s syllabus points in a loosey-goosey fashion, stretching the meaning of the syllabus points specifically addressing leases with proceeds royalty provisions to extend to leases that are in-kind leases. *See generally* ___ W. Va. ___, ___ S.E.2d. ___. As Justice Walker aptly noted in her dissent, which I joined, the majority of the Court in *Kaess* "muddl[ed] the distinction between different types of leases," ultimately "lo[sing] sight of the fact that the language of the in-kind royalty lease controls." *Id.* at ___, ___, ___ S.E.2d. at ___, ___ (Walker, J. dissenting).

[10] Furthermore, the majority's reliance on *Corder v. Antero Resources Corp.*, 57 F.4th 384 (4th Cir. 2023), to justify its outcome in the case is the epitome of circular reasoning. The majority states that the Fourth Circuit Court of Appeals rejected Antero's "first point of marketability" approach there. Maj. op. at 12 n.11. Yet—as the majority recognizes—in analyzing whether *Tawney* applied to the leases at issue in that case, the Fourth Circuit concluded that, "Because the West Virginia Supreme Court [of Appeals]

14

faith examination of what "point of sale" should and does mean in the broader context of our jurisprudence, is short sighted, and is, in my estimation, results-oriented.

Instead, in line with the Court's prior reasoning and adoption of other states' interpretation of the marketable product rule, I would have answered the district court's certified question as follows: when the duty to market is implicated and in the absence of contractual language to the contrary, "point of sale," for the purposes of the calculations of royalties pursuant to *Wellman* and *Tawney*, means in the place where and in a condition that a product is first rendered marketable, unless otherwise indicated in the subject lease. *See Kellam*, 247 W. Va. at 83, 875 S.E.2d at 221. Gas is marketable when it is in the physical condition to be bought and sold in a commercial marketplace and in the location of a commercial marketplace. "The determination of whether gas is marketable is a question of fact, to be resolved by a fact finder." *Rogers*, 29 P.3d at 906.

I emphasize that I would not have wholly abandoned more than two decades of precedent set forth in *Wellman* and expanded in *Tawney*. I instead would have decided this case narrowly, based upon the reasoning justifying those cases' outcomes at the time they were decided and in consideration and context of the facts giving rise to those decisions, rather than reading their syllabus points standing alone. *See McKinley*, 234

---

has not adopted a contrary rule, we conclude that the *Tawney* requirements apply through the point of sale." *Corder*, 57 F.4th at 397; Maj. op. at 12 n.11. The majority's analysis amounts to, in simple terms, "this is what the Fourth Circuit said we *might* do, so we better do it."

W. Va. at 149, 764 S.E.2d at 309. As discussed above, neither *Wellman* nor *Tawney* addressed interstate transportation costs.

For these reasons, I dissent from the majority's conclusion that lessees must pay all costs until the oil or gas, or byproducts, are *actually* sold, rather than at the first point the oil or gas is able to be sold.

### B. *The First Marketable Product Rule and Natural Gas Liquids*

Turning to the second certified question, which asks whether "the first marketable product rule extend[s] beyond gas to require a lessee to pay royalties on natural gas liquids ("NGLs"), and if it does, do the lessors share in the cost of processing, manufacturing, and transporting the NGLs to sale," the majority's conclusion—that lessees must pay costs for NGLs until the NGLs are sold—is equally misguided. Because the bedrock principles of the freedom to contract are judicially limited by *Tawney*, *Tawney* should be construed narrowly and only applied where necessary; its broad and unquestioning application to NGLs is particularly problematic given the leases at issue here. I further would have declined to answer this question because these issues concern the interpretation of the leases' language and factual questions related to marketability of NGLs.

Instead, the majority barges through its analysis, applying *Tawney*, when the *Tawney* opinion gives no indication that the Court then contemplated any costs outside of

the transportation and processing costs of oil and gas; particularly, it gives no suggestion that its syllabus point would also apply to NGLs, or, specifically "the costs incurred in processing, fractionating, and transporting residue gas and natural gas liquids to the point of sale,"[11] at the time the Court issued *Tawney*. Nor does it appear, at least on the face of the leases at issue here, that the parties to the leases contemplated NGLs at the time the leases were executed. In concluding that these costs for NGLs must be borne entirely by the lessees, the majority seems to base its reasoning on the simple idea of basic contract principles, finding the leases are ambiguous and therefore applying *Tawney*. The majority states that

> the dispositive question before us is whether the petitioners' leases contain clear, unambiguous language indicating the parties' agreement that royalties will be paid on the net sale price of residue gas and/or NGLs , i.e., the mineral owners' proportionate share of the sale price less their proportionate share of the costs incurred by the producer after the point at which the wet gas was rendered marketable.

Maj. op. at 21.

For both leases considered in the certified questions, the majority concludes that the leases are ambiguous as "to whether, when, and how royalties are payable to the lessor, and completely silent with respect to whether, when, and how postproduction costs may be deducted from the royalties." Maj. op. at 23 (repeating this language with respect to both leases). Ultimately, the majority expands *Tawney* and holds that

---

[11] Maj. op. at 24; Syl. pt. 8, in part, Maj. op.

17

> absent express language in a gas lease sufficient to satisfy the requirements set forth in syllabus point ten of *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 219 W. Va. 266, 633 S.E.2d 22 (2006), a producer/lessee may not deduct from a mineral owner/lessor's royalties a proportionate share of the costs incurred in processing, fractionating, and transporting residue gas and natural gas liquids to the point of sale.

Maj. op. at 23; Syl. pt. 8, Maj. op. I disagree with this conclusion, and would have declined to answer the second certified question.

At the outset, the parties' relationships are governed by the leases in place and other relevant evidence, and the leases here include different language in their royalty provisions. As the Court has previously stated, "oil and gas lease agreements are simply contracts and are to be construed as such." *Kellam*, 247 W. Va. at 89, 875 S.E.2d at 227.[12] In *Kellam*, the Court declined to answer a question that required the interpretation of an oil and gas lease, reasoning that answering the question "necessarily involves the exploration of contractual language, the possible need for interpretation of said language, and the development of facts to assist either the court or the factfinder, as appropriate." *Id.* at 81, 875 S.E.2d at 219. Similarly here, the district court asks this Court to, essentially, weigh in on the leases' impact and effect on the parties' responsibilities relating to NGLs. Yet "this Court cannot create a hard and fast rule" regarding the language in the leases at issue,

---

[12] *See* Syl. pt. 1, *McCullough Oil, Inc. v. Rezek*, 176 W. Va. 638, 346 S.E.2d 788 (1986) ("An oil and gas lease (or other mineral lease) is both a conveyance and a contract. It is designed to accomplish the main purpose of the owner of the land and of the lessee (or its assignee) as operator of the oil and gas interests: securing production of oil or gas or both in paying quantities, quickly and for as long as production in paying quantities is obtainable.").

because "the question is tied directly to the specific language of the lease and, if ambiguous, the parties' intent in contracting." *Id.* at 89, 875 S.E.2d at 227 And, as the Court has found in other circumstances, whether the evidence shows that the parties contemplated NGLs and any implied or express duty to market those NGLs "is a matter of contract interpretation, and will necessarily hinge upon the individual contract at issue." *See id.* (regarding whether the lease agreement indicates the costs and methods of deduction of certain post-production expenses). The royalty clauses the district court presented to this Court do not specifically mention NGLs. Therefore, whether the leases contemplate such products, and what the parties' duties are in regard to those products, are questions that "may only be answered by the district court and a factfinder, as appropriate, and not by this Court." *Id.* at 90, 875 S.E.2d at 228.

Furthermore, as I would have modified *Wellman* and *Tawney* to extend only until a product is marketable, not until it is sold, I would have also declined to answer this question because when and whether gas or its products (unprocessed, NGLs, or otherwise) are marketable is a question of fact. *Rogers*, 29 P.3d at 905.[13] As this Court has recently

---

[13] The petitioners contend that a recently decided case before the Sixth Circuit Court of Appeals, *The Grissoms, LLC v. Antero Resources Corp.*, 133 F.4th 605 (6th Cir. 2025), "rejected the notion that unprocessed natural gas containing NGLs is necessarily marketable," and submitted this case via letter pursuant to West Virginia Rule of Appellate Procedure 10(i). *The Grissoms* case concerned a direct appeal from a grant of summary judgment to the lessors by the federal district court regarding when a product became marketable. *See generally* 133 F.4th 605. At issue in that case was whether Antero could deduct processing and fractionation costs to separate and purify the gas, when the lease at issue provided that Antero could deduct costs that would "enhanc[e] the value of the marketable oil, gas or other products to receive a better price." *Id.* at 609 (quoting lease

stated, when this Court answers a certified question from a federal court, "the factual record regarding the legal issue in dispute must be sufficiently precise and undisputed." Syl. pt. 2, in part, *City of Huntington v. AmerisourceBergen Drug Corp.*, ___ W. Va. ___, ___ S.E.2d ___, No. 24-166, 2025 WL 1367333, at *1 (W. Va. May 12, 2025). Here, under my preferred analysis, the Court lacks appropriate undisputed facts to consider this question.

Additionally, any effort to answer the second certified question is advisory at this stage, as there is no interpretation of the contract regarding the parties' duties relating to NGLs, and it is not our place, in answering this certified question, to interpret those contracts. "Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes." Syl. pt. 1, in part, *Harshbarger v. Gainer*, 184 W. Va. 656, 403 S.E.2d 399 (1991) (quoting *Mainella v. Bd. of Trs. of Policemen's Pension or Relief Fund of Fairmont*, 126 W. Va. 183, 185-86, 27 S.E.2d 486, 487-88 (1943)). For these reasons, I would have declined to answer question two.

---

language). Essentially, the main question before the Sixth Circuit concerned marketability, and it affirmed the district court, finding that the record failed to "support Antero's position that any such market exists for the wellhead gas produced here." *Id.* at 613. Because *The Grissoms* demonstrates that marketability is a question of fact and interpretation of specific contractual language, this opinion supports my stance that the Court should have declined to answer the second certified question, particularly given my position that *Wellman* and *Tawney* should only extend until a product is able to be sold.

In summary, to the extent that the majority contends that its conclusions are merely a simple, logical application of *Wellman* and *Tawney*, I disagree. Rather, the majority's answers to the Northern District's certified questions stretch the principles established in these cases well beyond the syllabus points' original contemplation. Accordingly, I respectfully dissent.